STATE OF OKLAHOMA, et al., Appellants,

v.

Richard S. SCHWEIKER, et al., Appellees.

No. 80–1004.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 14, 1981.

Decided June 18, 1981.

Charles A. Miller, Washington, D. C., for appellants.

Linda M. Cole, Atty., Civ. Div., Dept. of Justice, Washington, D. C., with whom Alice Daniel, Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty., and Anthony J. Steinmeyer, Atty., Civ. Div., Dept. of Justice, Washington, D. C., were on the brief, for appellees.

Before TAMM, WALD and MIKVA, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

Appellants, eleven states,[1] question the constitutionality of the "pass-through" provision of the Supplemental Security Income (SSI) program of the Social Security Act (Act), §§ 1–2007, 42 U.S.C. §§ 301–1397f (1976). The pass-through provision, added to the Act in 1976, conditions the states' receipt of federal Medicaid funds on their

---

1. Appellants are the states of Alabama, Connecticut, Florida, Idaho, Illinois, Louisiana, Missouri, Nebraska, Oklahoma, Virginia, and Washington. Colorado and Michigan were parties below but have not joined in this appeal.

"passing through" to SSI recipients annual cost-of-living increases approved by Congress. *See* Act § 1618, 42 U.S.C. § 1382g (1976). Although similar conditions have previously been imposed by Congress, this device has never before been directly challenged by affected states. Appellants charge that the pass-through provision constitutes an abuse of the federal spending power and violates the Tenth Amendment. They also contest the interpretation given the scope of section 1618 by the Secretary of Health, Education and Welfare.[2]

Seeking declaratory and injunctive relief, the states brought this action in the United States District Court for the District of Columbia. On cross-motions for summary judgment, the court below granted judgment in favor of the federal government.[3] We affirm that order.

## I. THE LEGISLATIVE SCHEME

### A. *Statutory Background*

The Social Security Act was enacted in 1935 as "a series of related measures designed as a unified, well-rounded program of attack upon the principal causes of insecurity in our economic life." S.Rep.No.628, 74th Cong., 1st Sess. 2 (1935). It contained a number of titles pertaining to five broad subject areas: old-age security, unemployment compensation, aid to dependent children, public health measures, and aid to the blind. Titles I and X established grant programs enabling the states to assist, respectively, the aged and the blind. Title XIV, added to the Act in 1950, provided grants to the states for the benefit of the permanently and totally disabled.

Under these titles, the federal government reimbursed the states for part of the cost of cash payments made to assist the needy in acquiring food, shelter, and medical care. The states administered the programs and determined the levels of assistance, but they had to comply with various federal requirements in order to receive federal matching funds.

The Social Security Amendments of 1960, also referred to as the Kerr-Mills Act, provided additional financial incentives to induce states to improve medical care to the elderly. The new provisions were added to Title I, the basic assistance program for the aged. The House report indicated that state plans which attempted to finance the new health care programs by diverting funds from existing public assistance programs were to be disapproved. *See* H.R. Rep.No.1799, 86th Cong., 2d Sess. 8 (1960).

In 1962, Title XVI was enacted, which permitted states to consolidate their assistance programs for the aged, the blind, and the disabled. To encourage the states to take advantage of this legislation, Congress provided a more favorable ratio of federal matching funds for medical assistance to the blind and the disabled under a combined plan than under the former separate plans.

The Medicaid program, Title XIX of the Act, was established by the Social Security Amendments of 1965 and is now the largest federal-state matching fund program. *See Oklahoma v. Harris*, 480 F.Supp. 581, 583 (D.D.C.1979). The states were authorized by these amendments to set up comprehensive plans for supplying medical services to the needy. Health care providers were reimbursed by the states for the cost of medical care furnished to Medicaid recipients, and the states in turn recouped a portion of their expenditures from the federal government. The Medicaid program was designed to replace and consolidate the previously separate health care components of the states' various cash assistance programs. Congress directed that no state Medicaid plan was to be approved if it resulted in a reduction of basic maintenance assistance to the needy. *See* Act § 1902(c), 42 U.S.C. § 1396a(c) (1976).

---

2. That Department has been redesignated the Department of Health & Human Services, *see* 20 U.S.C. § 3508 (Supp. III 1979), but will be referred to here by its former title, which was in effect when appellants filed their complaint.

3. *See Oklahoma v. Harris*, 480 F.Supp. 581 (D.D.C.1979).

Cash assistance programs for the aged, the blind, and the disabled were federalized in 1972 with the establishment of the Supplemental Security Income program. The SSI program is described in Title XVI of the Act, which Congress revised to replace the old Titles I, X, XIV, and XVI. The federal government assumed responsibility for the administration and much of the cost of the former assistance programs; it also determined eligibility criteria for beneficiaries and set a uniform level of benefits to be given to all recipients.

This uniform national payment exceeded the assistance received by aid recipients under the superseded state-administered programs in some states, and was less than that received by recipients in other states. In order to ensure that no one suffered as a result of the new program, Congress determined that states whose grant programs had set assistance levels higher than the federal level should be required to make supplementary payments. Accordingly, Congress conditioned a state's eligibility for Medicaid funds on its willingness to make up any shortfall between the federal SSI benefit and the amount a beneficiary received from the state program as of December, 1973. *See* Pub.L.No.93–66, § 212, 87 Stat. 155 (1973), 42 U.S.C. § 1382 note (1976).[4]

Moreover, Congress encouraged the states to provide optional supplementary aid both to SSI recipients and to those who, though needy, do not meet federal eligibility standards under Title XVI. *See* Act § 1616, 42 U.S.C. § 1382e (1976); H.R.Rep. No.231, 92d Cong., 1st Sess. 199 (1971), U.S. Code Cong. & Admin.News 1972, p. 4989. Although this assistance comes entirely from state funds,[5] the federal government will, at the state's request, administer the payments at no cost to the state. *See* Act § 1616, 42 U.S.C. § 1382e (1976). Most states have chosen to provide supplementary assistance, *see* 122 Cong.Rec. 34,543 (1976) (remarks of Sen. Humphrey); *id.* at 28,280 (remarks of Rep. O'Neill), and it was the reduction of such payments that led Congress to enact the pass-through provision.

## B. *The Pass-Through Provision*

Title XVI guarantees SSI recipients automatic, annual cost-of-living increases based on the Consumer Price Index. *See* Act § 1617, 42 U.S.C. § 1382f (1976). These increases began in 1974 but have been offset in many states by a simultaneous reduction in the level of the state supplementary payment—sometimes by an amount equal to the cost-of-living increase, at other times by a lesser amount.[6] Thus, SSI recipients in those states have been denied the full benefit of the cost-of-living rises approved by Congress. Instead, the increased federal expenditures have gone to provide fiscal relief to the states.

In order to prevent this result, Congress enacted the pass-through provision in 1976. *See* Act § 1618, 42 U.S.C. § 1382g (1976). This section conditions states' receipt of federal Medicaid funds on their agreement to pass through to SSI recipients the full amount of the annual federal cost-of-living increases. A state that supplements federal SSI assistance must maintain those supplementary payments at a level no lower than that in effect in December, 1976, or in the first subsequent month in which supplementary payments are made. *See id.* § 1618(a),

---

4. The federal government agreed to reimburse a state for any difference between the amount of state funds paid in 1972 under the original matching fund program and the amount required in supplementary payments to maintain benefits at the 1972 level. *See* Pub.L.No.92–603, § 401, 86 Stat. 1485 (1972), 42 U.S.C. § 1382e note (1976). As a result of increases in the federal SSI benefit level, this "hold-harmless" clause now affects only three states—Hawaii, Massachusetts, and Wisconsin—none of which is a party to this case.

5. The only exception is due to the hold-harmless clause of the Act. *See* note 4 *supra*.

6. For example, only thirteen states passed through the entire 1976 SSI cost-of-living increase, while eight states passed through part of that increase. *See* 122 Cong.Rec. 24,455–56 (1976) (remarks of Rep. Fraser); *see also id.* at 34,543 (remarks of Sen. Humphrey) (similar figures for 1975).

42 U.S.C. § 1382g(a). A state is in compliance with this condition if its total expenditure on supplementary payments in any twelve-month period is no less than the amount spent in the preceding twelve months. *See id.* § 1618(b), 42 U.S.C. § 1382g(b).[7] The states are not obligated to increase the level of supplementary benefits—for example, to keep pace with inflation—but they must maintain the 1976 level of those payments.[8]

Appellants contend that this provision is an unconstitutional exercise of the congressional spending power and a violation of the Tenth Amendment because the condition imposed is totally unrelated to the Medicaid program. We turn now to discuss those allegations.

## II. THE SPENDING POWER

### A. *The Applicable Principles*

Appellants maintain that section 1618 exceeds congressional authority under the spending clause, which gives Congress the "Power To lay and collect Taxes . . . to . . . provide for the . . . general Welfare of the United States." Art. I, § 8, cl. 1. Appellants observe that none of Congress' enumerated powers permit it to require the states to devote a certain portion of their budgets to welfare programs. And they insist that that result may not be accomplished indirectly via the terms imposed by the pass-through condition, which is not related to the federal spending program conditioned, that is, Medicaid. On the other hand, the court below ruled, and appellees argue, that Congress may condition the receipt of federal benefits "[s]o long as the statute is reasonably related to the general welfare and is enacted in furtherance of the Congressional power to tax and to spend under the Constitution." 480 F.Supp. at 586.

We note initially that Congress' lack of authority to mandate directly the result it hopes to encourage by means of the pass-through provision is not an appropriate measure of congressional jurisdiction under the spending clause. The Supreme Court has long recognized that the power to spend for the general welfare is not limited by the direct grants of congressional power enumerated in article I. Rather, the general welfare clause is itself an independent—and expansive—source of Congress' spending authority. *See Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 2772, 65 L.Ed.2d 902 (1980) (opinion of Burger, C. J.); *Buckley v. Valeo*, 424 U.S. 1, 90–91, 96 S.Ct. 612, 668–69, 46 L.Ed.2d 659 (1976) (per curiam); *United States v. Butler*, 297 U.S. 1, 66, 56

---

7. Section 1618 provides in full:

(a) In order for any State which makes supplementary payments of the type described in section 1382e(a) of this title (including payments pursuant to an agreement entered into under section 212(a) of Public Law 93–66), on or after June 30, 1977, to be eligible for payments pursuant to subchapter XIX of this chapter with respect to expenditures for any calendar quarter which begins—

(1) after June 30, 1977, or, if later,

(2) after the calendar quarter in which it first makes such supplementary payments, such States must have in effect an agreement with the Secretary whereby the State will—

(3) continue to make such supplementary payments, and

(4) maintain such supplementary payments at levels which are not lower than the levels of such payments in effect in December 1976, or, if no such payments were made in that month, the levels for the first subsequent month in which such payments were made.

(b) The Secretary shall not find that a State has failed to meet the requirements imposed by paragraph (4) of subsection (a) of this section with respect to the levels of its supplementary payments for a particular month or months if the State's expenditures for such payments in the twelve-month period (within which such month or months fall) beginning on the effective date of any increase in the level of supplemental security income benefits pursuant to section 1382 of this title are not less than its expenditures for such payments in the preceding twelve-month period.

42 U.S.C. § 1382g (1976).

8. *See* notes 20 & 22 *infra.* In the three hold-harmless states, *see* notes 4 & 5 *supra* & accompanying text, Congress prohibited the federal government from failing to pass through an SSI cost-of-living increase by reducing its payments to support the state level of supplementation. *See* Pub.L.Nc.94–585, § 2(b), 90 Stat. 2902 (1976), 42 U.S.C. § 1382e note (1976).

S.Ct. 312, 319, 80 L.Ed. 477 (1936). Moreover, Congress' determination of what constitutes the general welfare is entitled to a good deal of deference. In *Butler*, the Supreme Court noted that one who contests congressional exercises of the spending power must show that "by no reasonable possibility can the challenged legislation fall within the wide range of discretion permitted to the Congress." *Id.* at 67, 56 S.Ct. at 320. Similarly, in *Helvering v. Davis*, 301 U.S. 619, 640, 57 S.Ct. 904, 908, 81 L.Ed. 1307 (1937), the Court held that a decision by Congress in this area may not be overturned "unless the choice is clearly wrong, a display of arbitrary power, [and] not an exercise of judgment."

In addition to Congress' broad power to spend for the general welfare, its ability to impose conditions on the receipt of federal funds is also unquestioned. As the Supreme Court held in *Oklahoma v. United States Civil Service Comm'n*, 330 U.S. 127, 144, 67 S.Ct. 544, 554, 91 L.Ed. 794 (1947), "[t]he offer of benefits to a state by the United States dependent upon cooperation by the state with federal plans, assumedly for the general welfare, is not unusual." *See also Fullilove*, 100 S.Ct. at 2772 (opinion of Burger, C. J.); *Massachusetts v. United States*, 435 U.S. 444, 461, 98 S.Ct. 1153, 1164, 55 L.Ed.2d 403 (1978) (plurality); *Lau v. Nichols*, 414 U.S. 563, 569, 94 S.Ct. 786, 789, 39 L.Ed.2d 1 (1974); *King v. Smith*, 392 U.S. 309, 333 n.34, 88 S.Ct. 2128, 2141 n.34, 20 L.Ed.2d 1118 (1968); *Ivanhoe Irrigation District v. McCracken*, 357 U.S. 275, 295, 78 S.Ct. 1174, 1185, 2 L.Ed.2d 1313 (1958); *Steward Machine Co. v. Davis*, 301 U.S. 548,

590–91, 57 S.Ct. 883, 892, 81 L.Ed. 1279 (1937).

The conditions that Congress may set in disbursing federal funds are not restricted to those areas over which Congress has direct regulatory authority. *See, e. g., Oklahoma v. United States Civil Service Comm'n*, 330 U.S. at 143, 67 S.Ct. at 553. Although there may be some limit to the terms Congress may impose, we have been unable to uncover any instance in which a court has invalidated a funding condition.[9] Several times the Supreme Court has specifically declined to articulate the precise boundaries of Congress' discretion, *see Fullilove*, 100 S.Ct. at 2773 (opinion of Burger, C. J.); *Lau*, 414 U.S. at 569, 94 S.Ct. at 789; *Butler*, 297 U.S. at 67, 56 S.Ct. at 320, and we see no need for this court to do so here. As discussed in part II(B) *infra*, we are satisfied that the pass-through provision represents an appropriate exercise of Congress' spending power, and we find that appellants have erred in characterizing the terms imposed by section 1618 as completely unrelated to Medicaid, the program conditioned.

Before considering those points, we reject the rigid nexus test proposed by appellants for determining the propriety of restrictions Congress sets on the use of federal funds. Appellants maintain that a condition must be precisely related to the purpose of the federal funds whose receipt is conditioned: they urge the court to approve only those conditions aimed at serving the same federal interest served by the funding program

---

9. For circuit and district court decisions upholding conditions imposed under the congressional spending power, see, e. g., *County of Los Angeles v. Marshall*, 631 F.2d 767 (D.C.Cir.), *cert. denied*, 449 U.S. 837, 101 S.Ct. 113, 66 L.Ed.2d 44 (1980); *New Hampshire Dep't of Employment Security v. Marshall*, 616 F.2d 240 (1st Cir.), *appeal dismissed*, 449 U.S. 806, 101 S.Ct. 53, 66 L.Ed.2d 10 (1980); *County of Los Angeles v. Adams*, 574 F.2d 607 (D.C.Cir.1978) (per curiam); *Florida v. Mathews*, 526 F.2d 319 (5th Cir. 1976); *Arizona State Dep't of Public Welfare v. Department of Health, Education & Welfare*, 449 F.2d 456 (9th Cir. 1971), *cert. denied*, 405 U.S. 919, 92 S.Ct. 945, 30 L.Ed.2d 789 (1972); *Texas Landowners Rights Ass'n v.*

*Harris*, 453 F.Supp. 1025 (D.D.C.1978), *aff'd mem.*, 598 F.2d 311 (D.C.Cir.), *cert. denied*, 444 U.S. 927, 100 S.Ct. 267, 62 L.Ed.2d 184 (1979); *Florida Dep't of Health & Rehabilitative Servs. v. Califano*, 449 F.Supp. 274 (N.D.Fla.), *aff'd mem.*, 585 F.2d 150 (5th Cir. 1978), *cert. denied*, 441 U.S. 931, 99 S.Ct. 2051, 60 L.Ed.2d 659 (1979); *North Carolina ex rel. Morrow v. Califano*, 445 F.Supp. 532 (E.D.N.C.1977) (three-judge court), *aff'd mem.*, 435 U.S. 962, 98 S.Ct. 1597, 55 L.Ed.2d 54 (1978); *City of Macon v. Marshall*, 439 F.Supp. 1209 (M.D.Ga.1977); *Stiner v. Califano*, 438 F.Supp. 796 (W.D.Okl. 1977) (three-judge court); *Dupler v. City of Portland*, 421 F.Supp. 1314 (D.Me.1976); *Vermont v. Brinegar*, 379 F.Supp. 606 (D.Vt.1974).

conditioned, here, Medicaid. That standard is not supported by the case law.

In *Oklahoma v. United States Civil Service Comm'n*, for example, federal highway funds were withheld from the state in an amount equal to two years' compensation of a state highway official who had violated the Hatch Act's prohibition of participation in political campaigns, § 12(b), 18 U.S.C. § 611(b) (1946) (current version at 5 U.S.C. § 1506(a) (1976)). Similarly, in *Lau*, the Court approved a spending condition based on section 601 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (1976), which broadly proscribes discrimination on the ground of race or national origin in "any program or activity receiving Federal financial assistance." And in *Fullilove*, the Court upheld a provision of the Public Works Employment Act of 1977, § 103(f)(2), 42 U.S.C. § 6705(f)(2) (Supp. III 1979), conditioning receipt of public works grants on an agreement by the state or local government grantee that at least ten percent of federal funds will be allocated to contracts with minority businesses. *See also District of Columbia v. Train*, 521 F.2d 971, 993 n.26 (D.C.Cir.1975) (citing section 2 of the Emergency Highway Energy Conservation Act, Pub.L.No.93–239, 87 Stat. 1046 (1974), 23 U.S.C. § 101 note (1976) (repealed 1975), which conditioned receipt of federal highway funds on state's enforcement of fifty-five-mile-per-hour speed limit), *vacated and remanded on other grounds sub nom. EPA v. Brown*, 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977) (per curiam); *Texas*

*Landowners Rights Ass'n v. Harris*, 453 F.Supp. 1025 (D.D.C.1978) (upholding provision that denies both direct federal financial assistance for acquisition or construction purposes and mortgage money from federally supervised private institutions if community fails to participate in national flood insurance plan), *aff'd mem.*, 598 F.2d 311 (D.C.Cir.), *cert. denied*, 444 U.S. 927, 100 S.Ct. 267, 62 L.Ed.2d 184 (1979); *City of Macon v. Marshall*, 439 F.Supp. 1209 (M.D. Ga.1977) (approving denial of federal mass transit grant to city that refused to continue collective bargaining rights of bus company employees).

In each of these cases, the condition imposed by Congress, and the behavior of the grant recipient that the condition was designed to affect, were not exactly correlated to the purpose for which the conditioned federal funds were dispensed: the conditions and the general funding programs were aimed at serving different federal interests. Nevertheless, the courts recognized that in each instance Congress had legitimately exercised its power to insist that those receiving federal benefits agree, in exchange, to abide by the condition set by Congress. In none of the cases did the courts require that Congress identify the relationship between the terms imposed and the purposes of the funding programs conditioned. Congress' constitutional power to fix conditions on the use of federal funds may not be held to the modest limits proposed by appellants.[10]

---

**10.** Appellants insist that dictum in two Supreme Court cases supports the nexus requirement they propose. *See Massachusetts v. United States*, 435 U.S. 444, 461, 98 S.Ct. 1153, 1164, 55 L.Ed.2d 403 (1978) (plurality) ("We have repeatedly held that the Federal Government may impose appropriate conditions on the use of federal property or privileges and may require that state instrumentalities comply with conditions that are reasonably related to the federal interest in particular national projects or programs."); *Ivanhoe Irrigation Dist. v. McCracken*, 357 U.S. 275, 295, 78 S.Ct. 1174, 1185, 2 L.Ed.2d 1313 (1958) ("Also beyond challenge is the power of the Federal Government to impose reasonable conditions on the use of federal funds, federal property, and federal privileges.... [T]he Federal

Government may establish and impose reasonable conditions relevant to federal interest in the project and to the over-all objectives thereof.").

Neither of these cases involved an argument that a term set by Congress was unrelated to the federal funds conditioned. In fact, in *Massachusetts* a user charge imposed on the states was challenged on the ground that states are immune from federal taxes; the plurality mentioned the spending power only by way of analogy. Moreover, in neither case did the Court adopt the rigid test advanced by appellants. The language quoted above may indicate only that the spending power must be exercised for the general welfare—that is, that a condition exceeds Congress' power if it is "unrelated in subject matter to activities fairly within the

## B. *The Controversy Here*

■ The condition imposed by the pass-through provision is clearly in line with the statutes upheld in the Supreme Court precedents cited above. The Court has long recognized that alleviating the economic insecurity of the needy is a legitimate congressional concern and one that may appropriately be pursued by use of the spending power. *See, e. g., Helvering v. Davis*, 301 U.S. 619, 644, 57 S.Ct. 904, 910, 81 L.Ed. 1307 (1937); *Steward Machine Co. v. Davis*, 301 U.S. 548, 593, 57 S.Ct. 883, 893, 81 L.Ed. 1279 (1937). Congress' purpose in enacting the pass-through provision was to ensure that cost-of-living increases approved by Congress would inure to the benefit of those whom the funds were designed to assist—SSI recipients, rather than the states. *See, e. g.*, 122 Cong.Rec. 34,543, 33,271, 28,278–84, 27,280–81 (1976). As Senator Humphrey noted:

> [T]he Congress did not intend for SSI recipients to lose ground by passing the cost-of-living increase. And our intent was not to provide budget support to State government. We have revenue sharing. We have other categorical programs which funnel funds into the States. This is not a State Assistance program. It is a program to aid the elderly, the blind, and the disabled.

*Id.* at 34,543.

Guaranteeing the proper use of federal funds is certainly an appropriate congressional concern, and one of the typical justifications for attaching conditions to grant programs. *See, e. g., North Carolina ex rel. Morrow v. Califano*, 445 F.Supp. 532, 534–35

scope of national policy and power." *Steward Machine Co. v. Davis*, 301 U.S. 548, 590, 57 S.Ct. 883, 892, 81 L.Ed. 1279 (1937); *see also United States v. Butler*, 297 U.S. 1, 66–67, 56 S.Ct. 312, 319–20, 80 L.Ed. 477 (1936); *Texas Landowners Rights Ass'n v. Harris*, 453 F.Supp. 1025, 1030 (D.D.C.1978), *aff'd mem.*, 598 F.2d 311 (D.C.Cir.), *cert. denied*, 444 U.S. 927, 100 S.Ct. 267, 62 L.Ed.2d 184 (1979); *North Carolina ex rel. Morrow v. Califano*, 445 F.Supp. 532, 535 (E.D.N.C.1977) (three-judge court), *aff'd mem.*, 435 U.S. 962, 98 S.Ct. 1597, 55 L.Ed.2d 54 (1978); *Vermont v. Brinegar*, 379 F.Supp. 606, 616 (D.Vt.1974).

(E.D.N.C.1977) (three-judge court) (federal health care grants conditioned on state's establishing a health planning agency that would approve development only of needed new health services; condition designed to ensure efficient use of federal funds), *aff'd mem.*, 435 U.S. 962, 98 S.Ct. 1597, 55 L.Ed.2d 54 (1978); *Dupler v. City of Portland*, 421 F.Supp. 1314 (D.Me.1976) (federal food stamp funds conditioned on state's not reducing welfare payments and similar aid). Here, Congress' objective could not be realized by amending Title XVI of the Act, the portion relating to SSI, because it is individual needy persons, not the states, that are entitled to the funds allocated to the SSI program. In order to induce the states to pass cost-of-living increases on to aid recipients, Congress deemed it necessary to attach the pass-through condition to the Medicaid provisions of the Act, under which funds are disbursed to the states. We do not find that this choice—involving the structure of the Social Security Act and the various methods used to disburse funds—renders the condition impermissible.

Appellants allege, however, that the condition is unconstitutional because there is no relationship between a state's supplementary payments, which are meant to be optional and to augment the uniform SSI benefit level set by Congress, and the Medicaid program, which provides basic medical assistance to the needy. We find this an overly simplistic and compartmentalized characterization of the Social Security Act. Even were we to accept appellants' suggestion that no link connects *state* supplementary benefits and Medicaid,[11] we could not

11. We note, however, that Congress has acknowledged the importance of state supplementation to the federal government's effort to alleviate economic insecurity—the goal of both the Medicaid program and SSI, *see* text accompanying notes 12–14 *infra*. Congress encouraged the states to furnish optional supplementary aid to the needy when it established the SSI program. *See* H.R.Rep.No.231, 92d Cong., 1st Sess. 199 (1971). The legislative history of the pass-through provision similarly reflects congressional recognition of the necessity of state supplementation. *See, e. g.*, 122 Cong. Rec. 28,284, 28,283, 28,280, 24,455 (1976) (re-

invalidate the pass-through condition. Appellants' description of section 1618 ignores the basic legislative purpose, which was not regulation of state supplementation programs. Congress did not mandate that states increase the level of supplementary benefits or devote a greater portion of their budgets to assistance programs. It only directed that SSI money appropriated by Congress for the benefit of the needy be spent on their behalf. The pass-through provision is therefore in essence a condition relating to the SSI program, not to state supplementary programs. Viewed in this way, section 1618 is permissible even under appellants' rigid nexus test: the assurance of SSI benefits—the purpose of the pass-through requirement—is closely tied to the goals of the Medicaid program.

Indeed, SSI and Medicaid are two interrelated components of the comprehensive federal effort to aid the aged, the blind, and the disabled. Both programs are aimed at the same target population—in fact, eligibility for SSI payments automatically entitles one to Medicaid benefits in most states [12]—but each focuses on satisfying a particular need. Under the SSI program, recipients are provided cash benefits to be used for basic subsistence, whereas Medicaid is designed to furnish needed medical services.

The relationship between the two programs is not surprising. As Congress has long acknowledged, the cost of medical care is one of the factors determining need, and there is a causal relationship between economic insecurity and ill health. *See, e. g.,* H.R.Rep.No.1300, 81st Cong., 1st Sess. 41 (1949); S.Rep.No.628, 74th Cong., 1st Sess. 21 (1935); H.R.Rep.No.615, 74th Cong., 1st Sess. 13 (1935). When, in 1935, Congress wished to make a "unified . . . attack" on the various causes of economic dependence, it naturally provided funds for both medical services and basic subsistence needs. S.Rep.No.628, 74th Cong., 1st Sess. 2 (1935). The Social Security Act thus comprised a number of measures, each "closely related to the others," that "together . . . constitute[d] a broad, practicable plan to safeguard the security of the American family." *Id.*

As originally enacted, the Act was structured according to type of recipient: Title I pertained to the aged, Title X to the blind, and Title XIV to the disabled. Each title included provisions relating to both health and welfare benefits. When the Social Security Amendments of 1960 created additional financial incentives to tempt the states to improve medical care to the elderly, the new health care provisions were added to Title I, the basic assistance program for the aged.

This categorical approach to aid programs proved cumbersome, and the organization of the statute gradually shifted so that classifications were made according to type of benefit. In 1962, the former Title XVI was enacted, which encouraged the states to combine their assistance programs for

marks of, respectively, Reps. Daniels, Abzug, O'Neill, Fraser).

Appellants complain, however, that the states were led to believe that supplementation of SSI benefits was completely discretionary and could be reconsidered at any time. *See* H.R.Rep.No.231, 92d Cong., 1st Sess. 199 (1971). But states cooperating with the federal government under the SSI program were clearly to be subject to such conditions "as the Secretary [found] necessary for effective and efficient administration." *Id.* at 200. Moreover, as the Supreme Court pointed out in *Helvering v. Davis,* 301 U.S. 619, 641, 57 S.Ct. 904, 908, 81 L.Ed.2d 1307 (1937), Congress' decisions regarding use of the spending power may change over time for "the concept of the general welfare [is not] static." In enacting the pass-through provision, Congress clearly spoke unambiguously enough to enable the states to make an informed choice whether to accept the terms imposed. *Cf. Pennhurst State School & Hospital v. Halderman,* —— U.S. ——, 101 S.Ct. 1531, 1539–45, 67 L.Ed.2d 694 (1981).

12. The Act provides that states may treat SSI recipients as automatically eligible for Medicaid. *See* Act § 1902(a)(10), 42 U.S.C. § 1396a(a)(10) (1976). Alternatively, a state may determine Medicaid eligibility by other criteria, which may be no more restrictive than those applicable to the state's cash assistance program on January 1, 1972. *See id.* § 1902(f), 42 U.S.C. § 1396a(f). Fifteen states have chosen the latter option. *See* Brief for Amicus Curiae at 6–7.

the aged, the blind, and the disabled. The medical assistance components of these programs were then consolidated in 1965 with passage of Title XIX, the Medicaid provisions. The Medicaid portion of the statute still covers medical services, while SSI was established in 1972 to provide basic assistance benefits. The route to the present statutory structure has been convoluted. But the process demonstrates that Medicaid and SSI are not independent programs; rather, their current form has evolved from an original statutory structure which clearly indicates that Congress views medical benefits and basic subsistence payments as components of one overall scheme.

Our interpretation is corroborated by other exercises of the congressional power to condition the use of social security funds; the pass-through provision is by no means unique in limiting a state's ability to reduce its welfare expenditures in return for federal medical care funds. For example, the Act directs the Secretary to disapprove state Medicaid plans that result in a decrease of basic subsistence payments. *See* Act § 1902(c), 42 U.S.C. § 1396a(c) (1976). This provision was enacted in recognition of "the need and urgency for states to maintain, if not improve, the level of basic maintenance provided for needy people under the public assistance programs," and its purpose was to "prevent any unwarranted diversion of funds from basic maintenance to medical care." S.Rep.No.404, pt. 1, 89th Cong., 1st Sess. 82–83 (1965); H.R.Rep.No. 213, 89th Cong., 1st Sess. 72 (1965), U.S. Code Cong. & Admin.News 1965, pp. 1943, 2023. Similarly, the Kerr-Mills Act required that state plans for medical care for the aged be rejected if they were to be financed by diverting funds from existing state assistance programs. Moreover, when the SSI program was initiated, and a uniform federal benefit level set, Congress conditioned receipt of Medicaid funds on state guarantees that recipients under the former state programs would suffer no decrease in benefits. A state that had been making assistance payments greater than the uniform SSI benefit level was thus required to make up the difference to all those on its welfare rolls as of December, 1973. *See* Pub.L.No.93–66, § 212, 87 Stat. 155 (1973), 42 U.S.C. § 1382 note (1976).[13]

The legislative history of the Social Security Act and of its amendments therefore refutes appellants' suggestion that the requirement that states pass through SSI cost-of-living increases is unrelated to the purposes of the Medicaid program. On the contrary, the relevant committee reports, the evolution of the Act's structure, and other conditions set by Congress all indicate that Medicaid funds and SSI benefits are two elements of one scheme with a single aim. We find nothing impermissible in Congress' conditioning a state's receipt of Medicaid funds on its compliance with section 1618's mandate regarding the use of SSI funds.[14]

We note that this result is consistent with our reluctance to become excessively involved in the legislative process. In general, the courts do not dictate to Congress the appropriate method for drafting statutes. It is up to Congress to decide whether the

13. *See also* 122 Cong.Rec. 33,272 (1976):
> Mr. HUMPHREY.... My amendment, as the Senator knows, would not require any State to increase its supplementary aid to any SSI recipient. It would only require that the States not reduce their level of support.
> We did that in revenue sharing. In revenue sharing we required that State governments are required to maintain their intergovernmental transfers to all units of local government at fiscal 1972 levels.
> Mr. LONG. In one way or another, time and again we have done things such as the Senator is suggesting.

14. Appellants argue, however, that the legislative history of section 1618 evidences no consideration by Congress of the relationship between that provision and the Medicaid program. We do not find the lack of discussion surprising or significant. The earlier legislative history of the Act and the conditions similar to the pass-through provision previously imposed by Congress suggest that the relationship between Medicaid and SSI is so well-accepted as to be implicit. Moreover, this court's duty is to interpret legislation; we do not generally instruct Congress on the type of findings it should make, or the type of discussions it should have, before passing a bill.

Social Security Act should be structured according to type of recipient, or according to type of benefit, and whether all funds should be disbursed in the same way, or some given directly to the recipients and others to the states.[15]  Likewise, Congress need not make specific findings about the relationship between a condition to be imposed on the disbursement of federal funds and the grant program conditioned.[16]  And the wisdom of the terms set by Congress is not an appropriate concern of ours.  *See Rosado v. Wyman,* 397 U.S. 397, 422, 90 S.Ct. 1207, 1223, 25 L.Ed.2d 442 (1970).  At some point, Congress' power to enforce restrictions on the use of federal money may be limited.  But we see no need to explore the boundaries of Congress' discretion in a case in which the condition imposed clearly serves a legitimate federal interest and is designed to effect the purposes of the statute to which it is attached.

### III.  THE TENTH AMENDMENT

Closely related to appellants' spending power argument is their challenge to the pass-through provision as violative of the Tenth Amendment.[17]  Appellants claim that section 1618 unconstitutionally diminishes the states' sovereign power by dictating budget choices.  The Tenth Amendment claim is based, once again, on the absence of a relationship between the condition and the funds conditioned and, additionally, on the Supreme Court's opinion in *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).  The first ground is as unpersuasive in this context as it was when advanced with respect to the congressional spending power.  As discussed above in part II, we find appellants' nexus test overly rigid and inconsistent with the case law, and we discern a reasonable connection between the purpose of section 1618—to ensure that SSI cost-of-living increases benefit assistance recipients—and the goals of the Medicaid program.

Second, *National League of Cities* by no means compels invalidation of the pass-through provision.  In that case, the Court overturned 1974 amendments to the Fair Labor Standards Act which extended the statute's wage and hour requirements to most state government employees.  *See* 29 U.S.C. § 203(d), (s)(6), (x) (1976 & Supp. III 1979).  The Court found that insistence that state governments adhere to those provisions exceeded Congress' power under the commerce clause, art. I, § 8, cl. 3, and violated the Tenth Amendment.  As every court reviewing challenges similar to that before us has held, the Supreme Court's opinion is distinguishable on two grounds.

First, the wage and hour provisions invalidated in *National League of Cities* were held to be in excess of Congress' power under the *commerce* clause.  The Supreme Court specifically declined to rule whether Congress could permissibly use its authority under the *spending* clause to "seek to affect integral operations of state governments." 426 U.S. at 852 n.17, 96 S.Ct. at 2474 n.17.  Although Congress may not direct the budgetary decisions of the states, it may set conditions on the grant of federal funds.  As the Supreme Court held in *Oklahoma v. United States Civil Service Comm'n,* 330 U.S. 127, 143, 67 S.Ct. 544, 553, 91 L.Ed. 794 (1947), "[w]hile the United States is not concerned with, and has no power to regulate, local political activities as such of state officials, it does have power to fix the terms upon which its money allotments to states

---

**15.** We assume, for example, that appellants would have no objection were the Act still structured according to type of beneficiary, and had Congress conditioned receipt of health care funds to assist the aged on a state's agreement to share responsibility for the cost of providing subsistence benefits to that group.  The condition and the restricted funds would then involve the same program, the same title of the statute, and the same beneficiaries.  We find no substantive distinction between this hypothetical and the case at bar.

**16.** At oral argument, counsel for appellants admitted that the states' argument would be weaker if Congress had included in section 1618 a finding about the relationship between Medicaid and the pass-through condition.

**17.** "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  Amend. X.

shall be disbursed." *National League of Cities* did nothing to repudiate that decision or the long line of cases, discussed in part II(A) *supra*, that permit Congress to impose conditions on the use of federal grants. This court has thus refused to extend *National League of Cities* to Tenth Amendment challenges to congressional action based on the spending power. *See County of Los Angeles v. Marshall*, 631 F.2d 767, 769 (D.C.Cir.), *cert. denied*, 449 U.S. 837, 101 S.Ct. 113, 66 L.Ed.2d 44 (1980). Other courts have ruled similarly.[18]

Second, the Fair Labor Standards Act amendments at issue in *National League of Cities* mandated that state employees receive certain wages and work a certain number of hours. The states were left with minimal discretion in implementing those provisions and were subject to civil and criminal penalties for violations. The Supreme Court thus found that the Act "*directly displace[d]* the States' freedom to structure integral operations in areas of traditional governmental functions" and "appear[ed] likely to have the effect of *coercing* the States to structure work periods . . . in a manner substantially different from the practices which [had] long been commonly accepted among local governments of this Nation." 426 U.S. 850, at 852,

96 S.Ct. at 2473 (emphasis supplied). Conditioning the receipt of federal grants does not similarly impose a direct restriction on states' decisionmaking: they may choose to conform to federal requirements or to forego federal funds. This circuit has therefore held that *National League of Cities* does not invalidate congressional attempts to induce state cooperation with federal plans. *See County of Los Angeles v. Marshall*, 631 F.2d at 769; *County of Los Angeles v. Adams*, 574 F.2d 607, 609 (D.C.Cir.1978) (per curiam); *Texas Landowners Rights Ass'n v. Harris*, 453 F.Supp. 1025, 1029–30 (D.D.C. 1978), *aff'd mem.*, 598 F.2d 311 (D.C.Cir.), *cert. denied*, 444 U.S. 927, 100 S.Ct. 267, 62 L.Ed.2d 184 (1979). *See also District of Columbia v. Train*, 521 F.2d 971, 992–93 (D.C.Cir.1975) (distinguishing congressional efforts to compel and to encourage before *National League of Cities*), *vacated and remanded on other grounds sub nom. EPA v. Brown*, 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977) (per curiam). Again, the decisions of other courts are in agreement.[19]

In this case, unlike *National League of Cities*, states are required to make no changes in policy but need only maintain their current level of assistance expenditures.[20] In *National League of Cities* itself,

---

**18.** *See, e. g., New Hampshire Dep't of Employment Security v. Marshall*, 616 F.2d 240, 247 (1st Cir.), *appeal dismissed*, 449 U.S. 806, 101 S.Ct. 53, 66 L.Ed.2d 10 (1980); *Florida Dep't of Health & Rehabilitative Servs. v. Califano*, 449 F.Supp. 274, 284 (N.D.Fla.), *aff'd mem.*, 585 F.2d 150 (5th Cir. 1978), *cert. denied*, 441 U.S. 931, 99 S.Ct. 2051, 60 L.Ed.2d 659 (1979); *North Carolina ex rel. Morrow v. Califano*, 445 F.Supp. 532, 536 n.10 (E.D.N.C.1977) (three-judge court), *aff'd mem.*, 435 U.S. 962, 98 S.Ct. 1597, 55 L.Ed.2d 54 (1978); *Dupler v. City of Portland*, 421 F.Supp. 1314, 1320 (D.Me.1976). *Cf. Usery v. Charlestown County School Dist.*, 558 F.2d 1169, 1170–71 (4th Cir. 1977) (refusing to extend *National League of Cities* to Tenth Amendment challenge to legislation based on congressional authority under § 5 of the Fourteenth Amendment); *Usery v. Allegheny County Institution Dist.*, 544 F.2d 148, 154–55 (3d Cir. 1976) (same), *cert. denied*, 430 U.S. 946, 97 S.Ct. 1582, 51 L.Ed.2d 793 (1977).

**19.** *See, e. g., New Hampshire Dep't of Employment Security v. Marshall*, 616 F.2d 240, 245 (1st Cir.), *appeal dismissed*, 449 U.S. 806, 101 S.Ct. 53, 66 L.Ed.2d 10 (1980); *Florida Dep't of*

*Health & Rehabilitative Servs. v. Califano*, 449 F.Supp. 274, 283–84 (N.D.Fla.), *aff'd mem.*, 585 F.2d 150 (5th Cir. 1978), *cert. denied*, 441 U.S. 931, 99 S.Ct. 2051, 60 L.Ed.2d 659 (1979); *North Carolina ex rel. Morrow v. Califano*, 445 F.Supp. 532, 536 & n.10 (E.D.N.C.1977) (three-judge court), *aff'd mem.*, 435 U.S. 962, 98 S.Ct. 1597, 55 L.Ed.2d 54 (1978); *City of Macon v. Marshall*, 439 F.Supp. 1209, 1217 (M.D.Ga. 1977); *Dupler v. City of Portland*, 421 F.Supp. 1314, 1320 & n.8 (D.Me.1976).

**20.** Not only are the states subject to no requirement that they increase expenditures on assistance programs, but they save roughly $124 million as a result of the enactment of SSI and federalization of aid programs: appellants spent approximately $317 million on aid to the aged, blind, and disabled in 1973 but only some $193 million in supplementary payments in 1976. *See* Defendants' Statement of Material Facts as to Which There Is No Genuine Issue at 2, *reprinted in* Joint Appendix (J.A.) at 30, 31; *cf.* Plaintiffs' Statement in Response to Defendants' Statement of Material Facts as to Which There Is No Genuine Issue at 1, *reprinted in*

the Supreme Court distinguished the costly wage and hour requirements of the Fair Labor Standards Act from the provisions of the Economic Stabilization Act of 1970, Pub.L.No.91–379, 84 Stat. 799 (1970), 12 U.S.C. § 1904 note (1976), approved in *Fry v. United States*, 421 U.S. 542, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975). That statute had authorized the President to freeze temporarily the wages paid state and local government employees in order to combat inflation. Such congressional action, the Court indicated in *National League of Cities*, was not contrary to the Tenth Amendment because, among other things, the freeze

> displaced no state choices as to how governmental operations should be structured, nor did it force the States to remake such choices themselves. Instead, it merely required that the wage scales and employment relationships which the States themselves had chosen be maintained during the period of the emergency.

426 U.S. at 853, 96 S.Ct. at 2475. That reasoning is equally applicable to the provision at issue in this case.

Other courts have approved more onerous conditions attached to federal spending programs, even though they interfere to some extent with state decisionmaking. Some such statutes have entailed substantially increased outlays of funds. *See, e. g., Lau v. Nichols*, 414 U.S. 563, 568, 94 S.Ct. 786, 789, 39 L.Ed.2d 1 (1974) (affirmative steps to alleviate language barriers preventing equal education opportunity); *Rosado v. Wyman*, 397 U.S. 397, 421, 90 S.Ct. 1207, 1222, 25 L.Ed.2d 442 (1970) (adjustment of state calculations of need to reflect changes in cost of living; incremental cost "massive"); *County of Los Angeles v. Marshall*,

631 F.2d at 768 (extension of unemployment benefits to state employees); *New Hampshire Dep't of Employment Security v. Marshall*, 616 F.2d 240, 248 (1st Cir.) (same; cost estimated as high as 1.1 million dollars), *appeal dismissed*, 449 U.S. 806, 101 S.Ct. 53, 66 L.Ed.2d 10 (1980); *Texas Landowners Rights Ass'n*, 453 F.Supp. at 1027–28 (administration and enforcement of measures regarding land management and use, flood control, and flood insurance); *Stiner v. Califano*, 438 F.Supp. 796, 798 (W.D.Okl.1977) (three-judge court) (certain staffing ratios for day care centers); *Vermont v. Brinegar*, 379 F.Supp. 606 (D.Vt. 1974) (payment of just compensation for removal of billboards). Others have mandated the enactment or amendment of a state law, *see Steward Machine Co. v. Davis*, 301 U.S. 548, 574–76, 57 S.Ct. 883, 884–86, 81 L.Ed. 1279 (1937); *Florida v. Mathews*, 526 F.2d 319, 322 (5th Cir. 1976); *City of Macon v. Marshall*, 439 F.Supp. 1209, 1214 (M.D.Ga.1977), or even a change in the state constitution, *see North Carolina ex rel. Morrow v. Califano*, 445 F.Supp. 532, 535 (E.D.N.C.1977) (three-judge court), *aff'd mem.*, 435 U.S. 962, 98 S.Ct. 1597, 55 L.Ed.2d 54 (1978).

Appellants insist that section 1618 is nevertheless coercive because the effect of violating the condition—loss of Medicaid funds—is so drastic that the states have no choice but to comply. We are unpersuaded. The Supreme Court admonished in *Steward Machine Co.* that courts should attempt to avoid becoming entangled in ascertaining the point at which federal inducement to comply with a condition becomes compulsion. Justice Cardozo wrote in that case, "to hold that motive or temptation is equivalent to coercion is to plunge the law in

J.A. at 32, 32 (calculating appellants' 1976 supplementary payments as totalling $199 million). *But see generally Reichenthal v. Harris*, 492 F.Supp. 637, 640 (E.D.N.Y.1980).

Appellants assert that the pass-through provision will entail increased costs for the states because caseload fluctuations and forecasting difficulties will prevent a state from being able to maintain exactly its total expenditures from the prior year. In order to avoid the risk of

being found in noncompliance, appellants continue, the state will likely increase expenditures. The Secretary foresaw this problem, however, and the regulations permit a state to correct a shortfall for any twelve-month period by making it up during the subsequent year or by making a single retroactive payment to affected beneficiaries. *See* 45 Fed.Reg. 54,742, 54,744, 54,749–50 (1980) (to be codified at 20 C.F.R. § 416.2096). *See also* note 22 *infra.*

endless difficulties." 301 U.S. at 589–90, 57 S.Ct. at 891–92.

The wisdom of those words is illustrated by the determination that appellants would have us make. The courts are not suited to evaluating whether the states are faced here with an offer they cannot refuse or merely a hard choice. Even a rough assessment of the degree of temptation would require extensive and complex factual inquiries on a state-by-state basis.[21] We therefore follow the lead of other courts that have explicitly declined to enter this thicket when similar funding conditions have been at issue. For example, in *New Hampshire Dep't of Employment Security*, which was approved by this court in *County of Los Angeles v. Marshall, see* 631 F.2d at 769, the First Circuit held:

> We do not agree that the carrot has become a club because rewards for conforming have increased. It is not the size of the stake that controls, but the rules of the game.

616 F.2d at 246. *See also Texas Landowners Rights Ass'n*, 453 F.Supp. at 1030.

Moreover, appellants' characterization of the pass-through provision as coercive is belied by other cases approving equally persuasive conditions imposed on the use of federal funds. *See, e. g., Lau*, 414 U.S. at 566, 94 S.Ct. at 788 (loss of all federal financial assistance); *New Hampshire Dep't of Employment Security*, 616 F.2d at 246 (forty-million-dollar cost in tax credits to private employers); *Texas Landowners Rights Ass'n*, 453 F.Supp. at 1027–28 (ineligibility for both direct federal financial assistance for acquisition or construction purposes and for mortgage money from federally supervised private institutions); *North Carolina ex rel. Morrow*, 445 F.Supp. at 533 (failure to qualify for federal money under some forty federal health assistance programs); *Dupler v. City of Portland*, 421

F.Supp. 1314 (D.Me.1976) (loss of food stamp funds). In addition, as noted above, Congress has previously enacted provisions that, like section 1618, condition receipt of Medicaid funds on compliance with certain requirements. *See* text preceding note 13 *supra.*

In sum, we find the pass-through condition consistent with the Tenth Amendment. Appellants' reliance on *National League of Cities* is misplaced because the provision at issue here is neither grounded on Congress' power under the commerce clause nor is it coercive. The impact of the pass-through provision on state activities does not render the condition invalid, and does not act to alter its essential nature as a permissible use of the congressional spending power to encourage state cooperation with federal plans.

## IV. THE SCOPE OF THE PASS–THROUGH PROVISION

Appellants' final argument raises an issue of statutory construction: they contest the Secretary's interpretation of section 1618 as applying not only to state supplementary payments that increase the benefits supplied SSI recipients, but also to state supplementation in the sense of assistance to those who, because of their income level, are ineligible for SSI benefits. This second category of supplementation will be referred to here as "state-only" benefits. The district court found that this challenge was not ripe because at that time the Secretary had not yet promulgated final regulations implementing the pass-through provision. *See* 480 F.Supp. at 588. Since the decision below, however, those regulations have been adopted. *See* 45 Fed.Reg. 54,742, 54,743, 54,749 (1980) (to be codified at 20 C.F.R. § 416.2095(b)(3)). The question is therefore ripe for review, and we turn now to discuss the merits of appellants' claim.[22]

---

**21.** Arizona, for example, does not participate in the Medicaid program and therefore is presumably uninfluenced by the pass-through provision. *See* Brief for Appellees at 22.

**22.** The Secretary's regulations define the supplementary payment level that may not be re-

duced under § 1618 as the total state payment given an individual with no countable income in December, 1976. *See* 45 Fed.Reg. 54,742, 54,744, 54,750 (1980) (to be codified at 20 C.F.R. § 416.2097(a)). Those persons in the state-only category whose outside income does not increase may be entitled to an increase in

The language of the pass-through provision is unambiguous in including both types of state supplementation. The state aid to which section 1618 applies consists of those "supplementary payments of the type described in section 1382e(a) of this title." Act § 1618(a), 42 U.S.C. § 1382g(a) (1976). The incorporated section, which is the portion of the Act that provides for state supplementation, defines state supplementary benefits as

> [a]ny cash payments which are made by a State (or political subdivision thereof) on a regular basis to individuals who are receiving benefits under this subchapter *or who would but for their income be eligible to receive benefits under this subchapter, as assistance based on need in supplementation of such benefits.*

the state supplementary payment as a result of the pass-through provision and its implementing regulations.

Suppose, for example, that A, an SSI beneficiary with no outside income, receives $150 from the federal government and $50 from the state, for a total income of $200. Assume also that B has an income of $165 and is therefore eligible only for state benefits; he would receive $35 from the state, for a total income, again, of $200. An SSI cost-of-living increase of $10 must be passed through to the recipients, so that A's income is now $210. If B's outside income does not change, the regulation's definition of supplementary payment level requires that the state increase its supplementary benefits to B by $10 so that he too has a total income of $210.

The Secretary considered this interpretation of "level" the one consistent with the legislative purpose of § 1618. The only other real alternative was to define "level" as the amount of state supplementation a particular individual receives. The Secretary rejected that construction for two reasons. It would mean, in the hypothetical above, that the state could not reduce its payment to A below $50 or its payment to B below $35. State benefits would then be frozen and could not reflect increases in a recipient's outside income. Moreover, individuals who became eligible for SSI after December, 1976, would not be protected by the pass-through provision. *See* 45 Fed.Reg. at 54,744–45.

Although § 1618 may require that a state increase payments to particular individuals, it does not as a result put an additional burden on the states. The Secretary has pointed out that the group of aid recipients represented by B in our hypothetical is not a large one. Typically,

*Id.* § 1616(a), 42 U.S.C. § 1382e(a) (emphasis supplied).[23]

Appellants argue that, despite this language, section 1618 could not possibly have been meant to refer to the state-only cases because aid to those who are not SSI beneficiaries does not "supplement" any federal payment. But a state may supplement a federal assistance program in two ways—either by supplying aid to those who are ineligible for federal benefits[24] or by increasing the amount of the benefit given federal recipients. State-only benefits are also supplementary in the sense that they supplement recipients' income. Use of the term "supplementary" in the pass-through provision to refer to both types of state assistance is therefore not unreasonable.

Appellants next point to the absence of any indication in the legislative history that those in the state-only category are eligible for social security benefits under Title II of the Act. Those payments increase automatically in response to the cost of living. *See id.* at 54,745. If B's outside income of $165 rises because of an increase in social security benefits, the state's need to increase its aid to him would be correspondingly reduced. Moreover, the states' fiscal concerns are met by the pass-through section's provision that states are in compliance with its mandate if their total expenditures on supplementary benefits in any year are not less than the total spent during the preceding twelve months. *See* Act § 1618(b), 42 U.S.C. § 1382g(b) (1976); *see also* note 20 *supra.*

23. The pass-through provision refers also to supplementation under Pub.L.No.93–66, § 212, 87 Stat. 155 (1973), 42 U.S.C. § 1382 note (1976), which conditioned states' eligibility for Medicaid funds on their willingness to supplement SSI benefits to ensure that no recipient lost income as a result of the enactment of the SSI program. *See* note 4 *supra* & accompanying text. Like § 1616(a), quoted in text, § 212 applies to both types of supplementation. No other section of the Act differentiates between the two categories of state benefits.

24. A provision in Title XIX illustrates this type of supplementation. Section 1902(a)(10)(C), 42 U.S.C. § 1396a(a)(10)(C) (1976), permits states to furnish supplemental Medicaid coverage to needy persons who would not otherwise receive Medicaid benefits because their income makes them ineligible for SSI or because they do not meet the state's eligibility criteria, *see* note 12 *supra.*

Congress intended the pass-through provision to apply to state-only cases. Section 1618 was offered as a floor amendment, and the only relevant legislative history therefore appears in the debates. It is true that this discussion focused on Congress' primary concern—that SSI recipients receive the benefit of cost-of-living increases. But courts need not find affirmative legislative history to support application of a statute according to its plain meaning. *See, e. g., Caminetti v. United States,* 242 U.S. 470, 485–86, 490, 37 S.Ct. 192, 194, 196, 61 L.Ed. 442 (1917).

As the contemporaneous construction of the agency charged with the statute's enforcement, the Secretary's regulations are entitled to deference from this court. *See, e. g., Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Power Reactor Development Co. v. International Union of Electrical, Radio & Machine Workers,* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961). The Secretary's interpretation of the scope of the pass-through condition was based on the specific reference to state-only cases in section 1616(a) of the Act, the section quoted above that is incorporated in the pass-through provision,[25] and the relatively equal financial position of those who are eligible for both SSI benefits and a state supplement, on the one hand, and, on the other, those who receive only a state supplement. *See* 45 Fed.Reg. at 54,743.

As noted above, we approve the Secretary's reading of the language of section 1618. The second premise of the interpretation—that inclusion of the state-only cases is conducive to fair and effective implementation of the legislative intent—is precisely the type of determination best left to an agency with expertise in the field. Moreover, as appellees point out, the conclusion is reasonable that enforcement of the pass-through condition would be impossible if states were permitted to reduce the level of benefits given to those who receive only state supplements. A number of states dispense all supplementary benefits in a single program, without regard to whether or not the beneficiary also receives federal SSI benefits. If appellants' construction of section 1618 were correct, so that some recipients of state supplements—those also eligible for SSI—might suddenly begin receiving greater benefits than did others—those only eligible for state supplements—the Secretary would clearly be hampered in his ability to determine whether the state was complying with the pass-through provision. The confusion increases, along with the difficulty of enforcing section 1618, when one considers that the pool of persons eligible for SSI is constantly fluctuating. *Cf. North Carolina ex rel. Morrow v. Califano,* 445 F.Supp. 532, 536 (E.D.N.C.1977) (three-judge court) (requiring certificates of need for all new health facilities—whether publicly or privately financed—held legitimate to prevent thwarting of congressional purpose), *aff'd mem.,* 435 U.S. 962, 98 S.Ct. 1597, 55 L.Ed.2d 54 (1978).

We therefore uphold the regulations' interpretation of section 1618: including state-only cases within its scope accords with the statutory language and is a reasonable exercise of the Secretary's authority to ensure fair and manageable administration of the provision.[26]

## V. CONCLUSION

We find the pass-through provision of the Social Security Act, § 1618, 42 U.S.C.

---

**25.** The regulations are also premised on the inclusion of both types of state supplementation in the other provision referenced in the pass-through section, Pub.L.No.93–66, § 212, 87 Stat. 155 (1973), 42 U.S.C. § 1382 note (1976). *See* 45 Fed.Reg. 54,742, 54,743 (1980); *see also* note 23 *supra.*

**26.** Appellants urge that this court reject the Secretary's construction of section 1618 in order to avoid a difficult constitutional question; they maintain that the pass-through provision is even more suspect if it applies to state-only cases because of the greater attenuation between that type of state supplementation and the Medicaid program. We dismiss this argument for the reasons discussed above in part II(B); *see especially* note 10 *supra.* Moreover, we note that in some states recipients of state-only benefits are automatically eligible for Medicaid. *See, e. g.,* Brief for Amicus Curiae at 8 (Alabama); *id.* at 17 (Oklahoma).

§ 1382g (1976), a conventional and appropriate exercise of Congress' authority under the spending clause. The courts have long recognized the legitimacy of Congress' interest in ensuring the proper use of federal funds and have upheld a variety of terms attached to federal grant programs for that purpose. These conditions need not be restricted to those areas over which Congress has direct regulatory authority, and they need not be, as appellants urge, exactly correlated with the purpose of the funding program conditioned.

The pass-through provision was enacted for the permissible objective of guaranteeing that SSI cost-of-living increases approved by Congress benefit those whom they were designed to assist, rather than subsidize the states. The inclusion of the pass-through section in Title XIX, relating to Medicaid, rather than in Title XVI, dealing with SSI, does not render the condition unconstitutional. This court does not generally instruct Congress on drafting and structuring statutes, and, in any event, even appellants' rigid nexus standard is satisfied. The purpose of section 1618—to ensure a certain level of benefits to SSI recipients—is closely tied to the aims of the Medicaid program, which is a related component of Congress' attack on poverty. The legislative history of the Act and of its amendments, the evolution of the statute's current structure, and other exercises of Congress' power to condition receipt of federal funds all corroborate this link between the two programs.

We likewise find the pass-through provision unobjectionable under the Tenth Amendment. The Supreme Court's opinion in *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), is not controlling because it involved a statute that was based on Congress' power under the commerce clause and that compelled action by the states. Section 1618, in contrast, is premised on the spending power and is not coercive.

Finally, we reject appellants' challenge to the regulations interpreting the scope of the pass-through provision. The Secre-

tary's determination that section 1618 applies to state supplementary payments in state-only cases is entitled to a good deal of deference from this court. In the absence of any controlling legislative history, the Secretary reasonably relied on the statutory language and his expert judgment of the prerequisites for fair and effective implementation of the pass-through provision.

*Affirmed.*