918 F.Supp. 1320 (1996)
STATE OF MISSOURI and Mel Carnahan, Governor of the State of Missouri, Plaintiffs,
v.
UNITED STATES of America, United States Environmental Protection Agency, United States Department of Transportation, and Carol M. Browner, Administrator of the United States Environmental Protection Agency, in her official capacity, Defendants.
No. 4:94CV01288.
United States District Court, E.D. Missouri, Eastern Division.
February 5, 1996.
*1321 *1322 Joseph P. Bindbeutel, John R. Munich, Attorney General of Missouri, Assistant Attorney General, Jefferson City, MO, Don M. Downing, Stinson and Mag, St. Louis, MO, for plaintiffs.
Eric T. Tolen, Asst. U.S. Attorney, Office of U.S. Attorney, St. Louis, MO, Ronald M. Spritzer, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC, for U.S.
Ronald M. Spritzer, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC, for Environmental Protection Agency, Department of Transportation, Carol M. Browner.

MEMORANDUM AND ORDER
FILIPPINE, District Judge.
This matter is before the Court for a decision on the merits following trial to the Court. After consideration of the pleadings, the testimony and exhibits introduced at trial, the parties' briefs, and the applicable law, the Court enters the following memorandum which it adopts as its findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.
Plaintiffs filed suit challenging the constitutionality of two sanctions provisions of the 1990 Amendments to the Clean Air Act, 42 U.S.C. § 7401, et seq., under the Tenth Amendment and the Spending Clause of Article I, Section 8, clause 1 of the United States Constitution.
The Clean Air Act ("CAA") requires the United States Environmental Protection Agency ("EPA") to establish National Ambient Air Quality Standards ("NAAQS") which must define the level of air quality necessary to protect the public health and welfare, 42 U.S.C. § 7409. Under the CAA, once EPA promulgates a NAAQS, each state must draft a State Implementation Plan ("SIP") which provides for the implementation, maintenance, and enforcement of the NAAQS in each air quality control region within the state. 42 U.S.C. § 7410(a).
*1323 All SIPs must be drafted to meet numerous specific substantive requirements of the CAA. 42 U.S.C. § 7410(a)(2). Each SIP must be adopted by a state after reasonable notice and a public hearing and must be submitted to EPA for approval. 42 U.S.C. § 7410(a)(1), (2). EPA first reviews the submission for completeness. If the plan is complete, the CAA requires EPA to approve or disapprove the plan within twelve months of the time the submittal is determined complete. 42 U.S.C. § 7410(k).
EPA has established NAAQS for a number of pollutants, such as carbon monoxide, nitrogen dioxide, and ozone. 40 C.F.R. Part 50 (1993). The CAA requires each State and EPA to designate as "nonattainment" those areas that have not achieved the NAAQS. 42 U.S.C § 7501-7515. With the CAA Amendments of 1990, which marked a comprehensive revision of the CAA, Congress established classifications for ozone nonattainment areas (marginal, moderate, serious, severe, and extreme), based on the amount by which the area exceeded the ozone NAAQS. In March of 1991, the Governor of Missouri designated the St. Louis area[1] as an ozone nonattainment area. For nonattainment areas, the CAA specifies the required elements of an SIP; for ozone nonattainment areas, these elements are based on the nonattainment area's classification. 42 U.S.C. §§ 7511-7511f.
States having nonattainment areas must submit to EPA the permit program for the construction of new and modified major stationary sources required by § 173. 42 U.S.C. § 7502(c)(5). The term "major stationary source" means, generally, any stationary facility or source of air pollutants which directly emits, or has the potential to emit, at least one hundred tons per year of any air pollutant. 42 U.S.C. § 7602(j). "Stationary source" means generally any source of an air pollutant except emissions resulting directly from an internal combustion engine for transportation purposes or from a nonroad engine or nonroad vehicle as defined in 42 U.S.C. § 7550. 42 U.S.C. § 7602(z). Under § 173(a)(1)(A), new or modified major stationary source can obtain a permit only if it demonstrates sufficient emissions reductions from other sources (offsets) by the time the new source commences operation to constitute "reasonable further progress" toward attainment of the relevant NAAQS. 42 U.S.C. 7503(a)(1)(A). Moderate ozone nonattainment areas, such as St. Louis, have a required offset of 1.15:1. In other words, a new or modified major stationary source must demonstrate that for each unit of emissions of pollutants it will add to the nonattainment area, there will be offsetting reductions of 1.15 units in the nonattainment area. 42 U.S.C. § 7511a(b)(5). States with moderate ozone nonattainment areas were required to submit a plan providing for such offset requirements by November 15, 1992. 42 U.S.C. § 7511a(a)(2)(C) & (b). The program contained in such a plan is part of a state's new source review (NSR) program.
The CAA provides for sanctions against a state when: (1) EPA finds that the state failed to make a required submission of an implementation plan or plan revision; (2) EPA finds that the state's submission fails to meet EPA's criteria for completeness; (3) EPA disapproves a state's submission; or (4) EPA finds that a state is not implementing a requirement of an approved plan. 42 U.S.C. § 7509(a)(1)-(4) ("CAA § 179"). EPA commonly refers to these four actions as "findings."
When EPA makes such a finding, and a state fails within eighteen months of the finding to correct the deficiency on which the finding was based, the mandatory sanctions provision of the CAA requires that one sanction apply until EPA determines that the state has corrected the deficiency. 42 U.S.C. § 7509(a). If the state fails to correct the deficiency for an additional six months after application of the first sanction, the CAA requires that a second sanction apply until EPA determines that the state has corrected the deficiency. Id.
EPA has promulgated a rule, which became effective in September 6, 1994, providing *1324 that mandatory sanctions under CAA § 179 apply only to the "affected area." 59 Fed.Reg. 39832, to be codified at 40 C.F.R. § 52.31(b)(3). EPA also promulgated another rule, which took effect September 6, 1994, that provides that when mandatory sanctions are imposed under CAA § 179, the offset sanction will be applied first, and the highway sanction second, unless EPA determines through a separate rulemaking to apply the sanctions in a different order. 59 Fed.Reg. 39832, et seq. (August 4, 1994).
The CAA Amendments strengthened the sanctions provisions by adding a 2:1 offset sanction and a highway funds sanction, both of which may be applied on a mandatory or a discretionary basis.[2] 42 U.S.C. § 7410(m). The offset sanction requires states to incorporate, as part of their permitting programs for new sources in the nonattainment area, an offset ratio of 2:1, instead of its normal offset ratio (such as 1.15:1). The highway funds sanction allows EPA to prohibit the Secretary of Transportation, with his approval, from approving highway funds for the nonattainment area. It gives the Secretary discretion, however, to fund certain projects designed, among other things, to promote safety and those that would improve air quality and not encourage single occupancy vehicle usage. 42 U.S.C. § 7509(b)(1)(A), (B).
The CAA requires the Administrator to promulgate a Federal Implementation Plan ("FIP") at any time within two years of finding that a state has failed to make a required submission, that the plan or plan revision submitted by the State does not satisfy the minimum criteria required, or of disapproving a submission in whole or in part unless the State corrects the deficiency and the Administrator approves the plan or plan revision prior to promulgating the FIP. 42 U.S.C. 7410(c)(1). EPA has authority to promulgate an FIP for Missouri and, at the same time, to impose mandatory or discretionary sanctions upon the State.
Under section 179, sanctions are automatically imposed eighteen months after a finding of deficiency is made, unless EPA has determined that the state has corrected the deficiency on which the finding was based. EPA does not have discretion to otherwise waive or delay the imposition of mandatory sanctions. If, within eighteen months of a finding of a violation, Missouri does not correct the deficiency, EPA will have authority to impose mandatory and discretionary sanctions; and the St. Louis ozone nonattainment area will be subject to an additional sanction within six months of the first sanction.
Missouri must submit SIP revisions addressing four main areas. These areas are: a plan for motor vehicle inspection and maintenance ("I/M program"); a plan regarding the emissions of nitrogen oxides ("NOx") and volatile organic compounds ("VOC") from major stationary sources; a plan for the attainment of the ozone NAAQS; and a fifteen percent Rate of Progress Plan, which is to include the measures necessary to achieve a fifteen percent reduction of VOC from the 1990 base-year emissions inventory in the St. Louis ozone nonattainment area. 42 U.S.C. § 7511a(b)(1).[3]
EPA has notified Missouri that the State failed to submit certain plan elements as required by the CAA. EPA's January 15, 1993, letter to Missouri indicated that the State failed to submit the required revised SIP for its existing I/M program submission; however, a subsequent rule declared that the resultant sanction would not be effective until September 6, 1994. Missouri submitted an enhanced I/M program SIP on September 1, 1994, which was found to be complete by EPA, and this finding stopped the sanctions process that had been initiated on January *1325 15, 1993. EPA emphasized, however, that it had not finally approved Missouri's revision and that "[i]f the SIP is disapproved, the Clean Air Act requires that the sanctions process be initiated again." Disapproval would start a new eighteen-month mandatory sanctions clock.
EPA also notified Missouri that it had failed to submit by November 15, 1993, a complete plan for the St. Louis ozone nonattainment area for achieving (by November 15, 1996) a fifteen percent reduction in VOC emissions relative to the 1990 emission base-line level, net of forecasted growth. Missouri has not yet submitted a complete plan for achieving the fifteen percent reduction.
EPA further notified Missouri that it had failed to submit a complete SIP for applying reasonably available control technology ("RACT") to all major NOx sources located in the St. Louis ozone nonattainment area. As of January 6, 1996, the expiration of the eighteen-months sanctions clock, the State had not submitted such a plan.[4]
Finally, Missouri has not yet submitted a complete plan for the attainment of ozone NAAQS by November 15, 1996. The CAA provides for moderate ozone nonattainment demonstrations to be submitted by November 15, 1993. 42 U.S.C. § 7511a(b)(1). However, EPA interpreted the Act to provide that moderate ozone nonattainment areas may delay submission of such attainment demonstration to November 15, 1994, if an area elected to perform photochemical grid modelling to demonstrate attainment. The State of Missouri elected to perform photochemical grid modelling to demonstrate attainment. Therefore, by November 15, 1994, Missouri was required to submit to EPA a complete plan that provides for emission reductions as necessary to demonstrate attainment of the NAAQS for ozone in the St. Louis ozone non-attainment area by November 15, 1996. That was the same date the parties submitted their joint stipulation. Although the joint stipulation does not indicate whether the State submitted a plan by that date, testimony adduced at trial indicated that, at least, the deadline was not met. Testimony of Joshua A. Tapp, Tr. IV, at 206-07. If EPA makes a finding that the State failed to submit an ozone nonattainment demonstration, the St. Louis ozone nonattainment area will be subject to sanctions if the State does not submit a complete demonstration within eighteen months of the finding.
In June of 1994, the Missouri General Assembly passed Senate Bill 590 authorizing Missouri's Department of Natural Resources (MDNR) to establish an I/M program that meets the CAA requirements for moderate areas. In September of 1994, MDNR submitted to EPA a rule implementing the bill. EPA has not yet approved this rule. On May 2, 1995, the General Assembly adopted the conference version of House Bill 6. This version deleted the FY 1996 appropriation for operation of the enhanced I/M program. However, Section 15.292 of House Bill 15 appropriates an amount of $1E[5] for the construction of state-owned inspection stations for the enhanced I/M program.[6]
*1326 Under Part V of plaintiffs' complaint entitled "Claims for Relief," Count One includes these statements:
Plaintiffs will suffer irreparable injury if the highway funds sanction is not enjoined, including, but not limited to the millions of dollars and the human resources the State will be required to expend to avoid the unconstitutional sanction. The State will never be able to recoup these financial and human resources. Therefore, Plaintiffs have no adequate remedy at law.
The highway funds sanction of the CAAA violates the Spending Clause of Article I, Section 8, Clause 1, and the Tenth Amendment of the United States Constitution.
Count Two states, in relevant part:
Plaintiffs will suffer irreparable injury if the offset sanction is not enjoined, including but not limited to the millions of dollars and the human resources the State will be required to expend to avoid the unconstitutional sanction. The State will never be able to recoup these financial and human resources. Therefore, Plaintiffs have no adequate remedy at law.
For these reasons, the offset sanction of the CAAA violates the Tenth Amendment to the United States Constitution.
In the prayer for relief, plaintiffs request that the Court: 1) enter a declaratory judgment "that the CAAA's highway funds sanction is invalid because it violates the Spending Clause and the Tenth Amendment" and "that the CAAA's offset sanction is invalid because it violates the Tenth Amendment"; 2) enter a permanent injunction "against enforcement of the highway funds and offset sanctions of the CAAA as to Plaintiffs"; and 3) award costs and such other relief as proper.
Defendants argue that the Court does not have subject matter jurisdiction over this case because jurisdiction belongs exclusively with the Court of Appeals. In support of this argument, defendants submitted a notice of supplemental authority to which they attached a copy of the court's slip opinion in Commonwealth of Virginia v. United States of America, No. 3:95CV21 (E.D.Va. June 12, 1995). In Virginia, the Commonwealth and its governor challenged the constitutionality of the sanctions provisions of the CAA. Prior to the filing of the lawsuit, EPA had disapproved Virginia's operating permit program under Title V of the CAA.[7]Virginia, supra, at 1-2. Additionally, EPA had found that Virginia had not submitted an I/M program and a plan to achieve a fifteen percent reduction in VOCs. Id. at 2. These findings triggered the CAA highway project conformity requirement under 42 U.S.C. § 7506(c)(1), the eighteen-month time clock for the imposition of mandatory sanctions pursuant to 42 U.S.C. § 7509(a), and the potential for the application of discretionary sanctions under 42 U.S.C. § 7410(m). Id. at 3-4.
Virginia filed a suit for declaratory and injunctive relief against the United States, EPA, the United States Department of Transportation, Carol M. Browner, EPA Administrator, and Secretary of Transportation Federico Pena. Id. at 4. The court stated that plaintiffs "question[ed] the constitutionality of ... (1) the Title V operating permit program requirement; (2) the I/M and VOC strategy SIP requirements; (3) the mandatory *1327 and discretionary sanction provisions; and (4) the transportation conformity requirement." Id. Plaintiffs claimed that these provisions violate the Tenth Amendment by unconstitutionally coercing Virginia to enact and enforce the regulatory programs "in derogation of state sovereignty." Id. at 4-5. Plaintiffs also contended that the highway funding provisions contravene the Spending Clause. Id. at 5.
The defendants moved to dismiss for lack of subject matter jurisdiction. They argued that the court had no jurisdiction to hear the constitutional challenges to Title V, the I/M program, the fifteen percent plan requirements, and the conformity requirements and related mandatory sanctions provisions because such claims could only be raised in the court of appeals.
The court noted that the CAA establishes a split jurisdictional scheme. Section 307(b)(1) provides:
[a] petition for review of the Administrator's action in approving or promulgating any implementation plan ... or any other final action of the Administrator under [the CAA] (including any denial or disapproval by the Administrator under subchapter 1 of this chapter) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit.
42 U.S.C. § 7607(b)(1). All final agency actions are accordingly subject to the exclusive jurisdiction of the courts of appeals. Harrison v. PPG Industries, Inc., 446 U.S. 578, 589, 100 S.Ct. 1889, 1896, 64 L.Ed.2d 525 (1980). The United States, therefore, argued that "all claims and challenges that relate to the judicial review of such "final action" must be brought exclusively in the Court of Appeals." Virginia, supra, at 7. The court stated that EPA had undoubtedly taken final action with respect to all plaintiffs' claims except their discretionary sanctions challenges. Id. Additionally, the court noted that plaintiffs had directly appealed the Title V final action to the court of appeals. Id.
The plaintiffs argued, as do the plaintiffs at bar, that the court had subject matter jurisdiction over their claims by virtue of the federal question jurisdiction statute. 28 U.S.C. § 1331. The court relied upon Natural Resources Defense Council v. Reilly, 788 F.Supp. 268 (E.D.Va.1992) in rejecting this argument. It applied the Reilly court's assessment of the CAA's jurisdictional scheme. In Reilly, the court had to decide whether or not plaintiffs' claim that EPA wrongfully did not promulgate standards requiring ORVR systems (onboard refueling vapor recovery) for vehicles was a challenge to a final agency action or whether it was a challenge to agency inaction for failing to act in accordance with the requirements of the CAA. 788 F.Supp. at 273. The court stated that the two main purposes behind the CAA's jurisdictional scheme were 1) "the existence of an underlying administrative record" and 2) "the concern for judicial economy." Id. The Virginia court then noted that the first factor leaned in favor of appellate jurisdiction because no factual record was necessary regarding the claims raised by the plaintiffs.
As to the consideration of judicial economy, the Virginia court noted that the plaintiffs had already appealed their Title V claim to the court of appeals. Additionally, it stated that § 307(b)(1) should be read broadly to "reach the class of claims that necessarily implicate" an EPA final action. Virginia, supra, at 15 (quoting Reilly, 788 F.Supp. at 273).
None of the plaintiffs in the cases relied upon by the Virginia court raised constitutional challenges to statutes or regulations. See Palumbo v. Waste Technologies Industries, 989 F.2d 156 (4th Cir.1993) (asserting that EPA issued permits in violation of state and federal environmental laws); Kamp v. Hernandez, 752 F.2d 1444 (9th Cir.1985) (challenging technical decisions made by EPA as violative of CAA and regulations); Indiana & Michigan Electric Co. v. EPA, 733 F.2d 489 (7th Cir.1984) (challenging whether under CAA EPA could "effectively disallow an integral part of a plan provision without determining that the part violates the requirements of the Act"). The Virginia court cited language in Palumbo which stated that when a statute provides courts of appeal with "exclusive jurisdiction over appeals from agency decisions, the district courts are without jurisdiction over the legal *1328 issues pertaining to those decisions." 989 F.2d at 161. The Virginia court reasoned that this language applied to the constitutional claims raised by the plaintiffs in that case.
This Court finds that the cases relied upon by the Virginia court are distinguishable and that the court's reading of § 307(b)(1) is too broad to divest this Court of jurisdiction over plaintiffs' constitutional claims. Accordingly, defendants' argument fails.
Defendants also argue that plaintiffs' claims are not ripe.[8] Plaintiffs characterize their claims as follows: first, the highway funds and offset sanctions violate the Tenth Amendment by unconstitutionally coercing the State to do the federal government's bidding; and second, the highway funds sanction places a condition on federal highway spending that is not rationally related to the purpose of highway spending and is also unduly coercive, thereby violating the Spending Clause.
Ripeness turns on two factors: 1) "the fitness of the issues for judicial decision," and 2) "the hardship to the parties of withholding court consideration." Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967); Wilson v. Robinson, 668 F.2d 380, 384 (8th Cir.1981). See also Wright & Miller, Federal Practice and Procedure § 3532, at 112. In other words, when the facts are sufficiently developed to allow a court to "consider the core issue of the constitutionality" of a statute, and when "substantial hardship would result" if a judicial decision were deferred, the case is ripe for review. Peick v. Pension Benefit Guaranty Corp., 724 F.2d 1247, 1261-62 (7th Cir.1983), cert. denied, 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984). See also Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission, 461 U.S. 190, 201, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983); Allstate Insurance Co. v. Wayne County, 760 F.2d 689, 696 (6th Cir.1985). It is not necessary that a party "`await consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough.'" Pacific Gas, supra, at 201, 103 S.Ct. at 1720 (quoting Regional Rail Reorganization Act Cases, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1975)). One factor to be considered in assessing fitness is whether the issue presented is purely legal. Allstate Insurance Co., supra, at 696 (citing Credit Union National Association v. National Credit Union Administration Board, 573 F.Supp. 586, 590 (D.D.C.1983)).
For the purposes of a Tenth Amendment inquiry, the appropriate focus is not on the alleged impact of a statute on a particular state program or economy but whether Congress has "directly compel[led]" the state "to enact a federal regulatory program." New York v. United States, 505 U.S. 144, 161, 112 S.Ct. 2408, 2420, 120 L.Ed.2d 120 (1992). See also Hodel v. Virginia Surface Mining & Reclamation Association, 452 U.S. 264, 292 n. 33, 101 S.Ct. 2352, 2368 n. 33, 69 L.Ed.2d 1 (1981) (indicating that in National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), the determinative factor in finding a violation of the Tenth Amendment was "the nature of the federal action, not the ultimate economic impact"). The Supreme Court has declared that even if an act were to have "measurable" impact on an economy, "this kind of effect, standing alone, is insufficient to establish a violation of the Tenth Amendment." Hodel, supra, at 292 n. 33, 101 S.Ct. at 2368 n. 33. As discussed in more detail below, the Court need only focus on the statutory scheme developed by the CAA in order to determine whether the offset and highway funds sanctions violate the Tenth Amendment. See New York, supra. The legal issue presented here "is one the resolution of which would be essentially unaffected by further factual development." Peick, supra, at 1261.
Since the filing of this lawsuit, the offset sanction has gone into effect.[9] According *1329 to the mandatory sanctions clock, the highway funds sanction will be imposed on July 6, 1996, unless Missouri complies with the CAA. The Court does not find merit in defendants' assertion that plaintiffs' facial Tenth Amendment attack on the highway funds sanction is not ripe because compliance by Missouri would prevent the sanction from applying. Defendants cannot argue that potential compliance with the very statute plaintiffs assert is unconstitutional prevents the Court from hearing plaintiffs' claims. No further facts need be developed to decide plaintiffs' Tenth Amendment claims, the offset sanction currently applies, and imposition of the highway funds sanction is imminent. Accordingly, plaintiffs' Tenth Amendment claims as to the offset and highway funds sanctions are ripe for review. See Virginia, supra, at 17 (stating that the purely legal issues presented by facial challenges to a statute are generally held to be ripe).
The Spending Clause challenge to the highway funds sanction presents a slightly different situation, however. Plaintiff wages a two-tiered attack on the sanction  first, that it places a condition on federal highway spending that is not rationally related to the purpose of highway spending, and second, that the sanction is so unduly coercive that it violates the Spending Clause.
Although plaintiffs attempt to characterize them as "as-applied" challenges, the first attack is a facial attack on the statute  the issues presented are purely legal. See Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("[t]he Spending Clause challenge to the highway funds sanction cuts to the essence of the provision and, thus, does not depend on its specific application to the State of Missouri."). The Court finds that in light of this fact, and taking into consideration the factors noted above, plaintiffs' facial attack on the highway funds sanction under the Spending Clause is ripe.
As to plaintiffs' claim of economic coercion under the Spending Clause, this "as-applied" claim is not ripe.[10] It is unclear how the sanction would be applied to Missouri. If imposed, the sanctions would not necessarily apply to all highway funds, even within the St. Louis nonattainment area. The Federal Highway Administration (FHWA) exempts projects that meet the statutory requirements and are otherwise approvable. Even if a project is not exempted initially, the State may be able to modify it to bring it within one of the exemptions or may submit new projects to qualify for federal funding. Exhibit 1, Defendants' Motion for Summary Judgment. Inquiry into the sanction's impact on Missouri would therefore involve speculation as to the projects from which funds might be withheld and the effects on Missouri's overall highway program. In a constitutional challenge, the Court must not render opinions based on an assumed and speculative set of facts. Johnson v. Sikes, 730 F.2d 644, 648-49 (11th Cir.1984). Accordingly, the Court finds that plaintiffs' as-applied challenge to the highway funds sanction fails to meet the fitness criteria and is therefore not ripe for review and will be dismissed without prejudice.
Even if plaintiffs' as-applied Spending Clause claim were ripe, the Court questions the viability of such a claim. First the four-part Spending Clause test, as articulated in Dole and reformulated in New York, has never included a "coercion test" as an element. Plaintiffs, however, construe language in Dole to mean that courts examining conditions tied to the receipt of federal funds must make an independent inquiry regarding pressure on the recipient. The language plaintiffs *1330 cite is: "Our decisions have recognized that in some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which `pressure turns into compulsion.'" South Dakota v. Dole, 483 U.S. 203, 211, 107 S.Ct. 2793, 2798, 97 L.Ed.2d 171 (1987) (quoting Steward Machine Co. v. Davis, 301 U.S. 548, 590, 57 S.Ct. 883, 892, 81 L.Ed. 1279 (1937)). Plaintiffs do not cite any cases that set forth a standard when compulsion has occurred. In fact, in Steward Machine Co. v. Davis, which plaintiffs cite in an attempt to demonstrate that courts do assess whether compulsion has occurred, the Court indicated that courts should not undertake such an inquiry:
[T]o hold that motive or temptation is equivalent to coercion is to plunge the law in endless difficulties. The outcome of such a doctrine is the acceptance of a philosophical determinism by which choice becomes impossible.
301 U.S. at 589-590, 57 S.Ct. at 891-892. See also Oklahoma v. Schweiker, 655 F.2d 401, 413 (D.C.Cir.1981). Furthermore, the Court is not aware of any instance in which the coercion theory has been applied in favor of the challenging party. See Nevada v. Skinner, 884 F.2d 445 (9th Cir.1989) ("The coercion theory has been much discussed but infrequently applied in federal case law, and never in favor of the challenging party.") (citations omitted), cert. denied, 493 U.S. 1070, 110 S.Ct. 1112, 107 L.Ed.2d 1019 (1990). In Nevada v. Skinner, the United States Court of Appeals for the Ninth Circuit additionally observed that one difficulty encountered by courts undertaking a coercion assessment is making "judicial judgments regarding a state's financial capabilities," noting that sovereign states are always free to increase their tax revenues. 884 F.2d at 448. See also Virginia, supra, at 12. Courts are not suited to evaluate whether states are faced with "offer[s] they cannot refuse" or merely "hard choice[s]." Schweiker, supra, at 414. Accordingly, it is ultimately up to the citizens of Missouri to decide if they want to put more money into their highway program.
As noted, plaintiffs argue that the highway funds and offset sanctions violate the Tenth Amendment and that the highway funds sanction also violates the Spending Clause. Plaintiffs do not protest the substantive provisions of the CAA; nor do they dispute that Congress can govern pollution sites directly. Rather, plaintiffs take issue with the manner in which Congress has chosen to implement the CAA.
The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." In New York v. United States, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), the Court laid out the framework for examining Tenth Amendment claims. In order to determine whether a statute violates the Tenth Amendment, courts must examine whether or not Congress has "`directly compell[ed] [a state] to enact and enforce a federal regulatory program.'" Id. at 161, 112 S.Ct. at 2420 (quoting Hodel, supra, at 288, 101 S.Ct. at 2366). The Court stated that when Congress has authority to regulate private activity under the Commerce Clause, it may "offer States the choice of regulating that activity according to federal standards or having state law pre-empted by federal regulation." Id. at 167, 112 S.Ct. at 2424 (citing Hodel, 452 U.S. at 288, 101 S.Ct. at 2366; Federal Energy Regulatory Commission v. Mississippi, 456 U.S. 742, 764-65, 102 S.Ct. 2126, 2140-41, 72 L.Ed.2d 532 (1982)). Congress may "hold out incentives to the State as a method of influencing a State's policy choices" or may "encourage a State to regulate in a particular way." Id. at 165, 112 S.Ct. at 2423.
New York involved the constitutionality of three provisions of the Low-Level Radioactive Waste Policy Act.[11] Two of these provisions were upheld as constitutional incentives that encouraged states to act in a particular way. A third provision, the "take title" provision, gave a state two options for handling *1331 certain radioactive waste within its borders: a state could either regulate the waste according to the instructions of Congress or it would be forced to take title to and accept liability for all damage caused by the waste. Id. at 174-75, 112 S.Ct. at 2427-28.
The Court examined each option independently to ascertain the constitutionality of each choice. It reasoned that no constitutional powers gave the federal government the authority to transfer the waste from generators to the state; nor could Congress have required states to become liable for the generators' damages. Id. at 175-76, 112 S.Ct. at 2428-29. The other path offered to the states  to regulate according to Congress' instruction  would have been a "simple command to state governments to implement legislation enacted by Congress." Id. at 176, 112 S.Ct. at 2428. The Court stated that Congress may not "`commandeer[] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program,'" as this alternate path would have done. Id. (quoting Hodel, supra, at 288, 101 S.Ct. at 2366). Therefore, because neither option standing alone would have been constitutionally permissible, Congress lacked the power to offer the states a choice between the two. Id.
In articulating its holding that the take title provision was unconstitutional, the Court noted
[T]he take title incentive does not represent the conditional exercise of any congressional power enumerated in the Constitution. In this provision, Congress has not held out the threat of exercising its spending power or commerce power; ... A choice between two unconstitutionally coercive regulatory techniques [ those present in the take title provision ] is no choice at all.
Id.
Plaintiffs do not argue that the sanctions imposed by the CAA Amendments are analogous to the take title provision in New York. Rather, they assert that Congress has presented the State with an illusory choice, thus coercing it to comply with federal mandates because the sanctions EPA threatens to impose, according to plaintiffs, would "severely curtail, if not halt, economic development" in Missouri.
However, as noted, New York makes clear that "coercion" is not determined by assessing the economic impact of a statute. Rather, a Tenth Amendment violation occurs when a state is made to choose between two "unconstitutionally coercive regulatory techniques," rather than between compliance or the threat of a valid exercise of Congress' other powers. New York, supra, at 176, 112 S.Ct. at 2428.
Through the offset and highway funds sanctions, Congress has done exactly what the Supreme Court indicated is constitutional: it has held out the threat of exercising enumerated powers. The cost of noncompliance is subjection to sanctions provisions that fall within Congress' Commerce Clause and spending powers and/or direct federal regulation through the FIP. Accordingly, the CAA does not violate the Tenth Amendment because it encourages state participation while leaving the ultimate decision to the citizens of each state, whether they prefer the benefits of participation in a state-administered program or the benefits of not spending state resources in the manner directed by Congress.
Plaintiffs do not contest the fact that Congress has the authority, under the Commerce Clause, to allow the EPA to implement an FIP for states that choose not to submit an SIP. Cf. Hodel, supra, at 283 & n. 21, 101 S.Ct. at 2363 & n. 21. When Congress has such authority, it may allow states to choose between regulating the activity themselves or having federal regulation pre-empt state law. New York, supra, at 167, 112 S.Ct. at 2424 (citations omitted).
The offset sanction is also a legitimate exercise of Congress' power under the Commerce Clause. Defendants assert, and plaintiffs agree, that Congress has broad power under the Commerce Clause to regulate in the area of environmental protection. Furthermore, in Hodel v. Virginia Surface Mining & Reclamation Association, Inc., 452 U.S. 264, 282, 101 S.Ct. 2352, 2363, 69 L.Ed.2d 1 (1981), the Supreme Court acknowledged *1332 that Congress can directly regulate sources of air pollution. 452 U.S. at 283 & n. 21, 101 S.Ct. at 2363 & n. 21 (citing cases). Congress may also proceed directly against polluters or forbid states from granting a permit to a polluter in contravention of the CAA standards. Cf. United States v. Ohio Department of Highway Safety, 635 F.2d 1195, 1205 (6th Cir.1980), cert. denied, 451 U.S. 949, 101 S.Ct. 2031, 68 L.Ed.2d 334 (1981) (upholding as a legitimate exercise of commerce power CAA provision permitting EPA to enforce regulation requiring states to withhold registration from vehicles that do not comply with applicable pollution standards); Brown v. Environmental Protection Agency 566 F.2d 665, 673 (9th Cir.1977) (same); District of Columbia v. Train, 521 F.2d 971, 989-90 (D.C.Cir.1975) (same), vacated as moot and remanded, 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977).[12] Under § 113(a)(5) of the CAA, EPA takes action directly against sources, not states. 42 U.S.C. § 7413(a)(5).[13] Therefore, by offering states the alternatives of submitting and implementing SIPs or having air pollution sources in nonattainment areas subject to a 2:1 offset ratio rather than a lower ratio, states retain a choice. While plaintiffs must include an offset requirement in any NSR plan they submit, they are not required to submit such a plan in the first place. The State is also not required to issue permits and may refuse to do so. Pursuant to the Commerce Clause, the federal government would then have the authority to directly regulate services using the 2:1 offset ratio in order to mitigate air pollution. See Hodel, supra, at 282 & n. 21, 101 S.Ct. at 2363 & n. 21. Accordingly, Congress is "threatening" to exercise its Commerce Clause power when it uses the offset sanction to induce compliance with the provisions of the CAA. This is permissible under the Tenth Amendment.
Defendants additionally assert that the highway funds sanction falls within one of Congress' enumerated powers, and therefore is valid under the Tenth Amendment. Defendants contend that this sanction is a valid exercise of Congress' spending power. Plaintiffs, on the other hand, challenge this assertion.
Under the Spending Clause, "`Congress may attach conditions on the receipt of federal funds.'" New York, supra, at 167, 112 S.Ct. at 2424 (quoting South Dakota v. Dole, 483 U.S. 203, 206, 107 S.Ct. 2793, 2795, 97 L.Ed.2d 171 (1987)). The Supreme Court has developed a four-part test to determine whether an act of Congress exceeds the limits of the Spending Clause. An expenditure will be upheld if 1) it is for the general welfare, 2) the "conditions imposed are unambiguous," 3) "the conditions imposed are reasonably related to the purpose of the expenditure," and 4) the condition does not violate any independent constitutional guaranty. Id. at 171-72, 112 S.Ct. at 2426-27. Plaintiffs offer two main objections to the highway funds sanction. First, they assert that the sanctions violate the third prong of the Spending Clause test, as articulated in New York. Second, plaintiffs argue that the sanctions are impermissibly coercive because they are so prohibitive as to constitute compulsion rather than mere pressure. This second argument, plaintiffs' "as-applied" claim, was addressed above in the Court's discussion of ripeness.
With respect to their claim that the conditions are not reasonably related to the purpose of the expenditure, plaintiffs attest that there is no "rational relationship" between the conditions imposed by Congress and the federal expenditure at issue because cleaner air is not a "purpose" of highway spending. Plaintiffs note that the condition addressed in Dole was acceptable under the Spending *1333 Clause because in Dole, the Court found a direct relationship between a uniform minimum drinking age and one of the stated purposes of federal highway spending  safe interstate travel.
However, the Dole Court never specified the degree of relationship required for a condition to pass constitutional muster under the Spending Clause, and the Court expressly left open that question. 483 U.S. at 208 n. 3, 107 S.Ct. at 2797 n. 3 ("[W]e do not address whether conditions less directly related to the particular purpose of the expenditure [at bar] might be outside the bounds of the spending power."). Interpreting this language, the Court in New York stated only that "conditions [on receipt of federal funds] must ... bear some relationship to the purpose of the federal spending, ... otherwise, of course, the spending power could render academic the Constitution's other grants and limits of federal authority." 505 U.S. at 167, 112 S.Ct. at 2423 (emphasis added) (citing Dole, supra, at 207-08, 107 S.Ct. at 2796-97). Therefore, this Court must examine whether there is "some relationship" between federal highway spending and the CAA Amendment's highway funds sanction.
Plaintiffs assert that while the federal highway statute, 23 U.S.C. § 101 et seq., addresses environmental issues and indicates that Congress desired that highway construction be carried out in a manner that is environmentally sound, the statute does not indicate that Congress has specifically declared that "a purpose" of federal highway funding is to achieve cleaner air. Thus, plaintiffs argue, the fact that Congress has declared that the purposes of federal highway spending are to be carried out in conjunction with other goals, one being environmental protection, does not mean that these other goals are all "purposes" of highway spending.
Here, plaintiffs would have this Court apply a more rigid standard than is warranted by case law. Plaintiffs imply that there must be a "direct" relationship between the spending and the condition or that Congress must have enacted the CAA and its amendments for the purpose of environmental protection. To the contrary, as noted in New York, this Court need only find evidence of "some relationship" between the condition and the expenditure. The Supreme Court has approved conditions that were not directly related to the purpose of the federal funding. See, e.g., Fullilove v. Klutznick, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (approving provision withholding public works funds for state and local grantees in program enacted to combat unemployment during recession unless grantees complied with minority business set-aside requirement); Oklahoma v. United States Civil Service Commission, 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794 (1947) (upholding condition withholding highway funds from state when highway official violated Hatch Act's prohibition against participating in political campaign). Upon examining the relevant provisions, the Court finds that a sufficient relationship exists and holds that this finding does not cause Congress' Spending Clause power to go unchecked.
As plaintiffs admit, Congress has stated its desire that highway construction be carried out in a manner that does not contribute to air pollution. Environmental goals in general and goals related to clean air, in particular, are further reflected in the highway funding provisions of Title 23. In fact, the declared purpose of the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA"), Pub.L. No. 102-240, 105 Stat.1914, which amended Title 23, was "to develop a National Intermodal Transportation System that is ... environmentally sound...."[14]
*1334 Examples of Congress' air quality improvement goals for federal transportation funding abound. Congress has designated specific funds provided under Title 23, the congestion mitigation and air quality improvement program, to fund projects in ozone and CO nonattainment areas that will contribute to improving air quality. 23 U.S.C. § 149. Congress has also determined that federal highway funds should not be used to fund projects in ozone and CO nonattainment areas that will significantly increase carrying capacity for single occupancy vehicles, unless the project is part of an approved congestion management system. 23 U.S.C. § 134(l). In metropolitan ozone and CO nonattainment areas, furthermore, the appropriate metropolitan planning organization must coordinate development of the required long range plan with development of transportation control measures in the SIP. 23 U.S.C. § 134(g)(3).[15]
Other provisions of Title 23 which reflect Congress' concern that transportation funding promote air quality and other environmental goals are numerous.[16] Moreover, in order to promote Congress' desire to maintain an environmentally sound highway system, the CAA, 42 U.S.C. § 7506(c), requires that all federally supported transportation projects be part of a transportation plan and Transportation Improvement Program ("TIP") which is in conformity with the applicable SIP under the CAA. The companion provision in 23 U.S.C. § 109(j) requires that the Secretary of Transportation "shall develop and promulgate guidelines to assure that highways constructed pursuant to this title are consistent with any approved plan for the implementation of any ambient air quality standard for any air quality control region designated pursuant to the Clean Air Act, as amended."
Furthermore, Congress declared, in its findings for the declaration of purpose behind the CAA, that one reason it passed the Act was that the growth in the amount of air pollution brought about, in part, by the "increasing use of motor vehicles" has endangered public health and welfare. 42 U.S.C. § 7401(a)(2).[17]See also Delaware Valley Citizens' Council v. Pennsylvania, 678 F.2d 470, 478 (3d Cir.) ("Congress has itself suggested the relationship between a failure to implement programs required by the Clean Air Act and a cut-off of Title 23 funds [as provided] in 42 U.S.C. § 7506(a). Such a cut-off serves both to induce implementation *1335 of the I/M program and to inhibit highway building, which itself contributes to the problems which the Clean Air Act is designed to remedy."), cert. denied, 459 U.S. 969, 103 S.Ct. 298, 74 L.Ed.2d 280 (1982). Additionally, the specific role of highway construction in contributing to increased vehicle use and increased air pollution is noted in the legislative history of the 1977 amendments to the CAA,[18] as was the superior ability of the states to implement motor vehicle I/M programs and other measures to combat such pollution. 23 Cong.Rec. S9168 (daily ed. June 8, 1977) (quoted in United States v. Ohio Department of Highway Safety, 635 F.2d 1195, 1203 (6th Cir.1980), cert. denied, 451 U.S. 949, 101 S.Ct. 2031, 68 L.Ed.2d 334 (1981)). Therefore, Congress reasonably decided to condition federal highway funding on state submission and implementation of acceptable SIP and SIP revisions, which are intended to control air pollution, including air pollution caused by motor vehicles.[19]
Alternatively, plaintiffs contend that even if environmental protection were a purpose of the federal highway statute, the highway funds sanction is not a rational way of achieving this goal. Plaintiffs ask the Court to find that the sanction has an adverse effect on air quality in the St. Louis nonattainment area, and is therefore irrational. They state that the highway funds sanction leads to an increase in traffic congestion which, in turn, leads to an increase in automobile emissions, thus adversely affecting the environment. However, the statute addresses the conflict posed by plaintiffs. Section 179(b)(1), 42 U.S.C. § 7509(b)(1), exempts many projects designed to reduce traffic congestion and any project that would otherwise be approvable and that will improve air quality and will not encourage single occupancy vehicle capacity. 42 U.S.C. § 7509(b)(1)(B)(viii). The exemption criteria set forth in § 7509(b)(1)(B) also provide that federal funds may continue to be approved for seven other categories of projects. The CAA expressly sets forth these criteria and does not require EPA or DOT to issue guidelines. The (FHWA) administers the exemptions and offers technical assistance to states in determining which projects meet the exemption criteria.[20]
*1336 The relationship between the highway funds sanction and highway spending need not be as narrowly defined as plaintiffs suggest. Although the relationship required has not been precisely articulated, in Dole, the Court indicated that a valid exercise of the Spending Clause power occurs when Congress "condition[s] the receipt of federal funds in a way reasonably calculated to address [the] particular impediment to a purpose for which the funds are expended." 483 U.S. at 209, 107 S.Ct. at 2797. See also Skinner, supra, at 447 (stating that conditions must be "reasonably related to the articulated goal" of highway spending). As the Court in Virginia stated, "[The State's] desire to show that air pollution will increase if federal funding dollars are withheld is a wild-goose chase. Scientific certainty is not required. It is enough that the condition be `reasonably calculated to advance the general welfare.'" Virginia, supra, at 12 n. 6 (quoting Dole, supra, at 208, 107 S.Ct. at 2796). Furthermore, the Court should not substitute its judgment for that of Congress. Cf. Southeastern Pennsylvania Transportation Authority v. Pennsylvania Public Utility Commission, 826 F.Supp. 1506, 1517 (E.D.Pa.1993) (discussing the reasonable relationship requirement in the context of the Commerce Clause), aff'd without opinion, 27 F.3d 558 (3d Cir.), cert. denied, ___ U.S. ___, 115 S.Ct. 318, 130 L.Ed.2d 279 (1994).
In Title 23 and in the CAA, there are numerous examples of Congress' concern for the effect of transportation on air quality. Ultimately, however, whether Congress selected the most appropriate method to achieve its goals or made a wise policy choice is irrelevant to this inquiry. For all of the above reasons, the Court finds that the highway funds sanction does not violate the spending clause.
Accordingly, defendants have demonstrated that through the CAA, Congress has held out the threat of exercising two of its enumerated powers  the commerce power, in the form of the offset sanction and FIP  and the spending power, in the form of the highway funds sanction. This kind of encouragement is exactly what the New York Court condoned.
Plaintiffs have also, in the course of this litigation, argued that a system of incentives combining both the commerce power and the spending power is unconstitutionally coercive because the State could potentially suffer highway funds sanction even when the federal government is regulating air pollution under its commerce power. However, New York did not indicate that Congress could hold out the "threat" of exercising only one of its delegated powers in offering a state a valid choice under the Tenth Amendment. The court there found that the Tenth Amendment was not violated by the exercise of the spending power and the commerce clause power in the Low Level Radioactive Waste Policy Amendments Act of 1985, even though Congress had there, as in the CAA, combined two incentives in one statute. Conversely in that case, with respect to the unconstitutional take title provision, the Court stated, "In this provision, Congress has not held out the threat of exercising its spending power or its commerce power; it has instead held out the threat, should the States not regulate according to one federal instruction, of simply forcing the States to submit to another federal instruction." New York, supra, at 176, 112 S.Ct. at 2428. The Court has already noted that the impact of *1337 the sanctions on Missouri is irrelevant for the purposes of plaintiffs' Tenth Amendment challenge: the choice remains. This choice is an incentive used by Congress. The State can choose to enact legislation according to the directives of Congress or it can do nothing and wait for the federal government to preempt this area and take over with an FIP, an exercise of its commerce power. This statute may be unlike any other because here, there is also added incentive in the form of highway funds and offset sanctions. However, for the purposes of the Tenth Amendment inquiry, under the guidelines of New York, the State is free to choose. Therefore, the offset and highway funds sanctions provisions of the CAA do not violate the Tenth Amendment.[21]
According to the Supreme Court, the rationale behind the Tenth Amendment is to prevent Congress from trammelling upon the decisionmaking power of the State and diminishing the accountability of federal and state officials. New York, supra, at 168-69, 112 S.Ct. at 2424-25. "Accountability is ... diminished when, due to federal coercion, elected state officials cannot regulate in accordance with the views of the local electorate in matters not pre-empted by federal regulation." Id. at 169, 112 S.Ct. at 2425. (citations omitted).
Plaintiffs finally argue that the sanctions will insulate the federal government from accountability because state legislators, not federal officials, will "bear the brunt of public disapproval." Id. The Court finds that this argument is not persuasive. Plaintiffs offer the I/M program as an example of a program that will cause the alleged blame-shifting. This is an ironic assertion, in light of the fact that Senate Bill 590 bears the opening remarks, "This enactment of the emissions inspection program is a mandate of the United States Congress under the federal Clean Air Act." S. 590, 87th General Assembly, 2d Sess., Mo. § 307.366, 11. 1-3. The bill also directs that the certifications of approval for vehicle emission systems bear the statement: "This cost is mandated by your United States Congress." Id. Additionally, by deleting funding for the operation of the I/M program, the Missouri General Assembly chose what plaintiffs previously claimed was "merely [a] theoretical" option. See South Dakota v. Adams, 506 F.Supp. 50, 58 (finding that statute was not coercive in light of the fact that the State had not enacted the legislation desired by Congress), aff'd sub. nom South Dakota v. Goldschmidt, 635 F.2d 698 (8th Cir.1980), cert. denied, 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 841 (1981). Congress has offered the State an attractive incentive for complying with the provisions of the CAA, and Missouri's citizens may blame or praise the General Assembly for the choice it makes.
For the reasons stated above, the Court shall enter judgment in favor of defendants on plaintiffs' Tenth Amendment claims and plaintiffs' facial attack on the highway funds sanction under the Spending Clause. Plaintiffs' "as-applied" attack on the highway funds sanction will be dismissed without prejudice.
Accordingly,
IT IS HEREBY ORDERED that the Court's ruling of May 16, 1995, is VACATED.
IT IS FURTHER ORDERED that plaintiffs' May 17, 1995, motion requesting that the Court take judicial notice of certain facts [document # 54] is GRANTED to the extent that judicial notice is taken only of the following *1338 facts: that on May 2, 1995, the Missouri General Assembly adopted the Conference Committee Report for Senate Committee Substitute for House Bill Substitute for House Bill 6 thus deleting Section 6.322, and, with it, the FY 1996 appropriation of approximately $22.5 million for the operation of the enhanced I/M program; that on May 3, 1995, the Missouri General Assembly adopted the Conference Committee Report for House Bill 15 ("HB15"); that Section 15.292 of HB15 appropriates the amount of "$1E" for the purchase of land, building of facilities, and the purchase of the equipment necessary to implement the I/M program. The motion is otherwise DENIED.
IT IS FURTHER ORDERED that, upon reconsideration, defendants' motion that the Court take judicial notice of recent legislative action or, in the alternative, that the Court allow supplementation of the record [document # 51] is DENIED.
IT IS FURTHER ORDERED that defendants' motion for summary judgment is DENIED as moot.
An appropriate judgment and order shall accompany this memorandum and order.

JUDGMENT and ORDER
In accordance with the memorandum and order filed this date and incorporated herein,
IT IS HEREBY ORDERED and ADJUDGED that defendants shall have judgment against plaintiffs on plaintiffs' claims under the Tenth Amendment of the United States Constitution as to the highway funds and offset sanctions and on plaintiffs' facial attack on the highway funds sanction under the Spending Clause of Article I, Section 8, clause 1 of the United States Constitution and that these claims are DISMISSED with prejudice.
IT IS FURTHER ORDERED that plaintiffs' "as-applied" claim against the highway funds sanction under the Spending Clause is DISMISSED without prejudice.
NOTES
[1] The St. Louis area consists of three counties in Illinois, four counties in Missouri, and the City of St. Louis. 40 C.F.R. § 81.326.
[2] When the Administrator of the EPA has made a finding under section 179(a), § 110(m) authorizes the Administrator, in her discretion, to impose sanctions on any portion of a state the Administrator determines reasonable and appropriate. 42 U.S.C. § 7410(m). EPA has interpreted this provision to authorize the imposition of sanctions at any time after the agency makes a finding under section 179(a). EPA has stated that it believes that discretionary sanctions may be imposed only after notice and comment rulemaking. 59 Fed.Reg. 1476 (Jan. 11, 1994). As noted, discretionary sanctions include the offset and highway funds sanctions.
[3] The 1990 base-year emission inventory identifies the range of sources located in the St. Louis ozone nonattainment area that emit VOC, NOx, and carbon monoxide ("CO").
[4] The joint stipulation of uncontested facts identified this date as February 6, 1996. Subsequent briefings and a hearing on an application for a temporary restraining order and motion for preliminary injunction clearly indicate that the date of the imposition of mandatory sanctions for the RACT deficiency finding is January 6, 1996.
[5] According to the declaration of Timothy D. Dawson, Director of Senate Appropriations,

an "E" appended to an appropriation designates that the appropriation is "open-ended." An "open-ended" appropriation does not have a fixed upper limit. The capital improvements appropriation for the enhanced I/M program for the St. Louis nonattainment area under HB15 could range from $1 up to whatever amount is necessary to fund construction of the enhanced I/M stations.
[6] On May 16, 1995, as plaintiffs requested, the Court took judicial notice of the facts set forth in plaintiffs' response to a motion for judicial notice filed by defendants. See infra. On May 17, 1995, plaintiffs then filed a formal motion requesting that the Court take judicial notice of the facts previously contained in their above-mentioned response. To clarify the record, the Court will vacate its ruling of May 16, 1995, and will grant plaintiffs' May 17, 1995, motion to the extent that judicial notice is taken only of the following facts: that on May 2, 1995, the Missouri General Assembly adopted the Conference Committee Report for Senate Committee substitute for House Bill substitute for House Bill 6 thus deleting Section 6.322, and, with it, the FY 1996 appropriation of approximately $22.5 million for the operation of the enhanced I/M program; that on May 3, 1995, the Missouri General Assembly adopted the Conference Committee Report for House Bill 15 ("HB15"), that Section 15.292 of HB15 appropriates the amount of "$1E" for the purchase of land, building of facilities, and the purchase of the equipment necessary to implement the I/M program. The motion will be otherwise denied.

Defendants had previously filed a motion requesting that the Court take judicial notice of "recent legislative action" in Missouri or supplement the record. On May 9, 1995, the Court took judicial notice of the facts set forth in and granted defendants leave to file that motion. However, upon reviewing all of the supplemental materials filed, the Court finds that the facts surrounding the recent legislative action in Missouri are fully and accurately reflected in the judicial notice taken by the Court pursuant to plaintiffs' May 17, 1995, motion; and, therefore, the Court will reconsider its May 9, 1995, ruling and deny defendants' motion.
[7] Title V requires states to create an approvable operating permit program and subsequent implementing regulations. 42 U.S.C. § 7661-7661f; 40 C.F.R. Pt. 70 (1994). Virginia's proposed program was rejected, in part, because EPA found that the Commonwealth had failed to establish proper statutory authority under which citizens could challenge state air permit decisions in state court. Virginia, supra, at 1-2.
[8] In their motion for summary judgment, defendants only argue that the highway funds sanctions are not ripe. However, in their notice of supplemental authority, they assert that plaintiffs' challenge to EPA's discretionary sanction authority under the CAA is not ripe.
[9] Subsequent factual developments are relevant to the Court's inquiry because it is the situation that exists at the time the Court decides ripeness that is relevant. Blanchette v. Connecticut General Insurance Corps., 419 U.S. 102, 139-40, 95 S.Ct. 335, 356-57, 42 L.Ed.2d 320 (1974) (finding that case had become ripe by the time it reached the Supreme Court although it was arguably not ripe trial court level: "[S]ince ripeness is peculiarly a question of timing, it is the situation now rather than the situation at the time of the District Court's decision that must govern").
[10] In their motion for summary judgment, plaintiffs argued that defendants waived their ability to raise the issue of ripeness by not raising it in their answer. This argument is without merit as the issue of ripeness goes directly to the Court's subject matter jurisdiction and may be raised at any time. Johnson v. Sikes, 730 F.2d 644, 648 (11th Cir.1984).
[11] The Low-Level Radioactive Waste Policy Act of 1985 required states to provide for the disposal of waste generated within their borders. It contained three conditions designed to encourage states to comply with the Act.
[12] Although the courts in those cases struck down other provisions of the CAA regulations as they existed then, the courts specifically upheld the regulation that prohibited states from registering nonconforming vehicles.
[13] This section states, in relevant part:

Whenever ... the Administrator finds that a State is not acting in compliance with any requirement or prohibition of the chapter relating to the construction of new sources or the modification of existing sources, the Administrator may 
(A) issue an order prohibiting the construction or modification of any major stationary source in any area to which such requirement applies.
42 U.S.C. § 7412(a)(5).
[14] ISTEA established two major highway funding programs, the National Highway System for highways of national significance, 23 U.S.C. § 103(a), (b), and the surface transportation program (STP), 23 U.S.C. § 133, for most other highways. Funds from both programs can be used for car pool programs, fringe and corridor parking facilities, bicycle transportation and pedestrian walkways, transit projects, and wetlands mitigation projects. See 23 U.S.C. §§ 103(i); 23 U.S.C. § 133(b).

Additionally, STP funds can be used for "mitigation of damage to wildlife, habitat, and ecosystems." 23 U.S.C. § 133(b)(1). Ten percent of the STP funds may only be used for transportation enhancement activities, 23 U.S.C. 133(d)(2), which, according to § 101, include ten generally pro-environment activities.
[15] ISTEA added detailed new metropolitan and statewide planning requirements in 23 U.S.C. §§ 134 and 135 to insure that federally assisted projects are selected through a detailed and comprehensive planning process. Both metropolitan and statewide planners must consider, among other things, the overall "social, economic, energy and environmental effects of transportation decisions." 23 U.S.C. § 134(f)(13); 23 U.S.C. § 135(c)(11). The metropolitan planning process must also include consideration of the programming of transportation enhancement activities. 23 U.S.C. § 134(f)(5).

Statewide planning also requires consideration of state plans developed pursuant to the Federal Water Pollution Control Act, 23 U.S.C. § 135(c)(9).
[16] In addition to the provisions previously mentioned, Title 23 includes the following conditions:

§ 109(h)  requires that economic, social, and environmental effects be considered in developing federally assisted highway projects so that final decisions are made in the best overall public interest, considering inter alia "air, noise, and water pollution";
§ 109(i)  requires development of noise level standards;
§ 109(j)  requires that federally assisted projects be "consistent" with CAA implementation plans;
§ 131  (Highway Beautification Act) requires states to regulate signs along federally aided highway systems. States must remove illegal billboards visible from interstate highways.
§ 138  prevents parklands, wildlife refuges, and historic sites from being used for federally assisted highway projects, unless there is no feasible and prudent alternative;
§ 217  provides general authority to use federal aid highway funds for bicycle and pedestrian facilities;
§ 319  authorizes the use of federal funds for landscaping and enhancement of scenic beauty, including the planting of wild flowers.
[17] Congress stated:

[T]he growth in the amount and complexity of air pollution brought about by urbanization, industrial development, and the increasing use of motor vehicles, has resulted in mounting dangers to the public health and welfare, including injury to agricultural crops and livestock, damage to and the deterioration of property, and hazards to air and ground transportation.
42 U.S.C. § 7401(a)(2).
[18] The 1977 Amendments added the first version of the highway funds sanction to the CAA.
[19] In Oklahoma v. Schweiker, 655 F.2d 401, 406 (D.C.Cir.1981), the United States Court of Appeals for the District of Columbia Circuit rejected a similar argument: that under the Spending Clause, conditions imposed by Congress under the "pass-through" provision of the Supplemental Security Income program of the Social Security Act were "completely unrelated" to the federal spending program conditioned, Medicaid. 655 F.2d at 405, 406. The Schweiker court declined to impose the standard proposed by appellants  that conditions must be "exactly correlated to the purpose for which the conditioned federal funds were dispensed." Id. at 407. The court cited numerous cases in which conditions were upheld despite the lack of a "rigid nexus." Id. at 409. Furthermore, addressing the appellants' argument that the legislative history of the pass-through provision showed no consideration by Congress of the relationship between that provision and Medicaid, the District of Columbia Circuit stated, "We do not find the lack of discussion surprising or significant." Id. at 410 n. 14. The relationship in that case was "implicit." Id. "Moreover," the court continued, "this court's duty is to interpret legislation; we do not generally instruct Congress on the type of findings it should make, or the type of discussions it should have, before passing a bill." Id. This Court agrees that its function is not to engineer the legislative process, but merely to examine the results.

Additionally, the court in District of Columbia v. Train, 521 F.2d 971 (D.C.Cir.1975), vacated as moot, 431 U.S. 99, 52 L.Ed.2d 166 (1977), implied that the source of the funds is irrelevant for Spending Clause purposes:
The federal government traditionally obtains state cooperation and participation in federal regulatory programs by offering the states a sufficiently attractive incentive or by threatening to withdraw a federal benefit they are presently receiving.
521 F.2d at 993 n. 26. Thus the court did not indicate any belief that the federal benefit must have been granted under the same statute out of which the conditions arose.
[20] Plaintiffs argue, however, that at least 70% of the funds for Missouri's major transportation project, the 15-Year Plan, would not be exempt from the sanction because the Plan's goal, to build highways in order to connect communities in the state, does not fall within the range of exempt purposes  the Plan will actually increase single occupancy vehicle usage. Plaintiffs assert that in order to receive funding for the Plan, Missouri would have to devote its available money to maintenance or repair projects and would have to cancel virtually all other projects. Yet, by plaintiffs' own admission, Missouri's transportation needs far exceed the available funds, over both the short and long term, and the State has sufficient needs such that available federal highway funds could be effectively used on exemptible projects. To the extent that Missouri faces impediments in using the flexibility available to the states under the CAA, those impediments are of Missouri's own making.

Essentially, plaintiffs argue that Congress is forcing the State to rearrange its priorities with respect to using federal money. They claim that if the State were to be sanctioned, Congress would be effectively forcing Missouri "to renege on the commitment it made to its citizens to complete the projects in the 15-Year Plan." However, federal money is not guaranteed to the State, and the General Assembly should have been aware of the possibility of not receiving the funds. The 15-Year Plan was published in January of 1992, long after the enactment of the 1990 CAA Amendments. Missouri "can hardly claim either a vested right in the federal funds being offered or the right to set the conditions on which the money will be provided." South Dakota v. Dole, 791 F.2d 628, 634 (8th Cir.1986), aff'd, 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987).
[21] Plaintiffs submitted a supplemental brief that called to the Court's attention the Supreme Court's decision in United States v. Lopez, ___ U.S. ___, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). In Lopez, the Court held that the Gun-Free School Zones Act of 1990 was unconstitutional because it exceeded Congress' authority under the Commerce Clause. In so holding, the Court recognized that Congress' enumerated powers have "judicially enforceable outer limits." Lopez, supra, at ___, 115 S.Ct. at 1633. Plaintiffs claim that this case indicates a renewed interest in federalism issues on the part of the Supreme Court and assert that the case at bar therefore has heightened importance. Additionally, plaintiffs note that Justice Kennedy's concurrence stated that when the federal government intrudes on state regulatory powers, "the boundaries between the spheres of federal and state authority ... blur." Id. at ___, 115 S.Ct. at 1638 (Kennedy, J., concurring). This Court finds that the CAA is consistent with the principles avowed in Lopez.